**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION**

| | |
|---|---|
| **EDWARD PEARS,** | ) |
| | ) |
| **Plaintiff,** | ) |
| | ) |
| **v.** | )   **CIVIL ACTION 08-0385-WS-B** |
| | ) |
| **MOBILE COUNTY,** *et al.*, | ) |
| | ) |
| **Defendants.** | ) |

**ORDER**

This matter comes before the Court on defendants' Motion for Summary Judgment (doc. 50). The Motion has been briefed and is ripe for disposition.[1]

**I.    Background Facts.**[2]

Plaintiff, Edward Pears, is an African-American male who began working as a court police officer at the Mobile County Courthouse in December 1994. (Pears Dep., at 33-34, 37;

---

[1]    Also pending is defendants' Motion for Extension of the Page Limitation for their Reply Brief (doc. 58). Pursuant to Local Rule 7.1(b), reply briefs in support of a motion ordinarily cannot exceed 15 pages. Defendants request leave to file an 18-page reply, on the grounds that the additional pages are needed to address fully the issues raised in Pears' opposition brief. Given the modest enlargement requested and the numerous factual and legal issues implicated by the parties' principal briefs, the Court in its discretion **grants** the Motion for Extension of the Page Limitation and will accept as filed defendants' reply brief appended to the Motion.

[2]    The Court is mindful of its obligation under Rule 56 to construe the record, including all evidence and factual inferences, in the light most favorable to the nonmoving party. *See Skop v. City of Atlanta, GA*, 485 F.3d 1130, 1136 (11th Cir. 2007). Thus, plaintiff's version of the facts is taken as true and all justifiable inferences are drawn in his favor. The Court rejects defendants' contention that all of their Suggested Determinations of Undisputed Fact are deemed admitted pursuant to Local Rule 7.2(b) because plaintiff did not file a line-by-line rebuttal of same. Although the better practice is for a non-movant to delineate specifically by number which of the movant's suggested determinations of fact are disputed, Local Rule 7.2(b) requires only that the nonmovant "shall point out the disputed facts appropriately referenced to the supporting document or documents filed in the action." *Id.* Over the span of 95 paragraphs of facts set forth in his summary judgment response, Pears has done that, albeit without expressly stating which of those facts are at odds with defendants' proposed facts. Accordingly, defendants' Suggested Determinations of Undisputed Fact are not deemed admitted.

Collier Dep., at 117-18.)  He was discharged on January 22, 2007 for the stated reason that he had failed a mandatory drug test.  (Graddick Decl., ¶ 5; Plaintiff's Exh. 21.)  In his Complaint (doc. 1), Pears maintains that he was fired because of his race and in retaliation for having made internal complaints of race discrimination, in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §§ 2000e *et seq.*; as well as 42 U.S.C. §§ 1981 and 1983.  The three named defendants are Mobile County, 13th Judicial Police Department, and James Collier (individually and in his official capacity as police chief).

> ### A.      *Pears' Employment History in the Thirteenth Judicial Police Department.*

Although the Complaint focuses on Pears' discharge in January 2007, neither the termination of his employment nor the circumstances on which his claims of discrimination and retaliation are predicated can be understood in a vacuum.  Review of Pears' employment history at the Thirteenth Judicial Police Department is imperative to understanding the parties' respective positions on summary judgment.[3]

---

[3]      Defendants attempt to expand the record considerably by injecting evidence and argument concerning Pears' employment with the Mobile County Sheriff's Department in the early 1980s and with Ingalls Shipbuilding, Inc., in the early 1990s.  (Defendants' Brief (doc. 50-2), at 4, 26-28; Reply Brief (doc. 58-2), at 6-7.)  In that regard, defendants have submitted copies of a resignation letter from Pears to the Mobile County Sheriff's Department dated September 18, 1982, an EEOC letter to Pears and Ingalls dated July 1994, and various other documents remote in time and place to the claims at issue here.  The apparent purpose of defendants' detour is to show that Pears made complaints of discrimination decades ago while working for other employers, even though he testified in this case that those previous employers had not discriminated against him, and thereby to tar Pears as a liar, a serial "cry-wolf" complainant, or both.  Evidence about what Pears may have done in the distant past when he was working for different entities, and his present recollection of those experiences, may or may not be admissible at trial, and may be explored by the parties via motion in limine at an appropriate juncture.  Such attacks on a party's credibility are distinctly unhelpful, however, to a summary judgment analysis of whether Pears has adduced sufficient evidence to reach a jury on his contentions that defendants in this case engaged in unlawful race discrimination and retaliation when they disciplined and fired him in 2006 and early 2007.  It is improper on summary judgment to discredit a party via such collateral matters.  This Court is emphatically not engaged in the function of weighing Pears' credibility at this time.  *See, e.g., Moorman v. UnumProvident Corp.*, 464 F.3d 1260, 1266 n.1 (11th Cir. 2006) ("Credibility determinations at the summary judgment stage are impermissible.").  The same goes for defendants' insinuation that Pears is a racist because he had "accidentally or 'not knowingly' used racial slurs himself."  (Doc. 50-2, at 28.)  This evidence represents another improper tactic to impugn plaintiff's character or damage

       1.     *The May 2006 Complaint of Discrimination, and Plaintiff's Suspension.*

As an initial matter, the summary judgment record reflects that Pears voiced complaints of race discrimination during his 12 years of employment with the Mobile Thirteenth Judicial Police Department.  Most notably, on May 31, 2006, Pears submitted a written memorandum to all five supervisors in his chain of command, including Sgt. Gerry Hummel (his immediate supervisor), Lt. Bob Patterson, defendant James Collier (then-Chief of the Thirteenth Judicial Police Department), Mobile County Circuit Judge Joseph Johnston (then-Director of the Thirteenth Judicial Police Department), and Mobile County Circuit Judge Charles Graddick (Presiding Judge of the Thirteenth Judicial Circuit Court).  (Plaintiff's Exh. 9; Pears Dep., at 170-71.)  Pears' May 2006 memo was, by its terms, "a formal complaint regarding discriminatory practices by the Chief of Mobile Court police ...."  (Plaintiff's Exh. 9.) Specifically, Pears wrote in that memo that Chief Collier "and/or his designees have continuously engaged in acts of blatant racial discrimination" in such areas as "scheduling, assignments, promotions, raises, and granting of overtime."  (*Id.*)  According to the May 2006 memo, Pears had brought these concerns to Chief Collier and his "designees" on multiple occasions, but "no favorable action has been taken" as they responded with "a lack of concern, unwillingness to intelligently discuss the issues ... and actions which may be construes s [*sic*] retaliatory."  (*Id.*)  Pears' memo urged an investigation and implementation of a system "free of racially discriminatory actions."  (*Id.*)

The May 2006 memo provoked an immediate and forceful response.  On June 2, 2006, Chief Collier sent Pears a letter on Thirteenth Judicial Circuit Police Department letterhead that (1) unequivocally denied that Pears had ever come to him, Lt. Patterson or Sgt. Hummel regarding any items described in the memo; (2) notified Pears that he had breached chain of command protocols by bringing his concerns to Judges Johnston and Graddick, for which he would "face disciplinary action"; and (3) demanded that Pears furnish supporting details of his

---

his credibility on summary judgment.  Besides, defendants' argument unfairly distorts and exploits plaintiff's benign testimony that he "may have" accidentally used a slur outside the workplace.  (Pears Dep., at 136.)  Defendants' devotion of approximately 5 pages of its summary judgment memoranda to such efforts to cast Pears as a liar or a racist does not advance their cause.

claims within 10 days.  (Plaintiff's Exh. 10.)

      With respect to the chain of command issue, it is undisputed that in August 2000, Chief Collier sent a memorandum on Thirteenth Judicial Circuit Police Department letterhead to all Department employees, including Pears.  That memorandum provided that employees making written complaints to their immediate supervisors or Chief Collier "shall not send copies of the written letter or memo to anyone" else, and that the supervisor would determine "whether the letter or memo requires forwarding to other persons."  (Plaintiff's Exh. 28.)  Essentially, then, Chief Collier's August 2000 memo forbade Pears from submitting written complaints to Judges Johnston or Graddick.  That is precisely what Pears did with his May 2006 memo.[4]  On June 16, 2006, Chief Collier notified Pears in writing that Pears was being suspended without pay for five days, effective June 19, 2006, because his May 2006 discrimination complaint violated the chain of command policy.  (Plaintiff's Exh. 13.)[5]  The decisionmaker for this suspension was Judge Johnston.  (*Id.*; Johnston Aff., ¶ 3; Collier Dep., at 39; Graddick Dep., at 30.)  The June 16 memo cautioned Pears that "[s]ubsequent displays of disrespect and failure to follow directives will result in additional disciplinary action including termination."  (Plaintiff's Exh. 13.)  Plaintiff's evidence is that no other officer at the Thirteenth Judicial Police Department had ever been disciplined for not adhering to the chain of command policy.  (Patterson Dep., at 35.)  Plaintiff's evidence is also that the Department's discrimination policy expressly instructed employees that "[i]f the immediate supervisor is the person discriminating, report the situation to the Lieutenant or Chief."  (Plaintiff's Exh. 8; Graddick Dep., at 40.)  Indeed, Chief Collier understood that if a

---

[4]      Apparently, Chief Collier's memo of August 2000 was reinforced in February 2005, when Lt. Patterson circulated a memo notifying Department employees that the chain of command would be strictly enforced.  Although Lt. Patterson's memorandum is referenced in several documents, the February 2005 memorandum appears not to be part of the record.

[5]      Lt. Patterson and Sgt. Hummel initially requested that Pears be suspended without pay for 7 days; however, Chief Collier recommended a suspension without pay of 5 days, and Judge Johnston approved Chief Collier's recommendation.  (Plaintiff's Exh. 12.)  Lt. Patterson and Sgt. Hummel's request memo, which was forwarded to Judge Johnston, sets forth their position that Pears' allegations were "totally false, ha[d] no substance and [were] totally frivolous," and that Pears was nothing more than "a disgruntle [*sic*] employee that constantly undermines and circumvents directives and immediate supervisors."  (*Id.*)

supervisor is the discriminatory agent, the employee is permitted by that discrimination policy to go above his head and bring his complaint directly to the supervisor's supervisor, chain of command notwithstanding.  (Collier Dep., at 46.)[6]

Setting aside the chain of command issue and associated suspension, Pears authored a follow-up memorandum to Chief Collier on June 9, 2006, wherein he purported to provide detail supporting his claims of race discrimination.  In particular, Pears complained that he had been denied overtime, that he had been denied access to court computers that less senior employees had been allowed to use, that he was assigned 5-day workweeks while less senior employees worked just 4 days in 10-hour shifts, that he was denied work hours (and the hours of his choosing) while the Lieutenant and Sergeant worked whenever they wanted, and that merit raises had been given only to less senior employees.  (Plaintiff's Exh. 11.)  Pears requested investigation into these matters.  On June 26, 2006, Chief Collier sent Pears a point-by-point rebuttal of his accusations.  At that time, Chief Collier purported to "refute all statements and concerns in your letter," accused Pears of improperly trying to "supervise [his] supervisors," and closed with an ominous warning that Pears was an at-will employee who could be terminated at any time, with or without cause.  (Plaintiff's Exh. 14.)[7]

### 2.    *Other Employment Actions against Pears in the Second Half of 2006.*

The five-day suspension of Pears in June 2006 was only the beginning of the disciplinary actions taken against him.  On July 28, 2006, Sgt. Hummel sent Pears a "Letter of Reprimand" after the two men argued concerning the procedure for assigning weekend overtime shifts.  Sgt. Hummel wrote that Pears had been "argumentative and challenging" to him in the presence of other officers and expressed displeasure at Pears' suggestion that he would go over Sgt.

---

[6]    Chief Collier testified that if Pears had asked for permission to discuss his discrimination complaints with Judge Johnston, such permission would have been granted. (Collier Dep., at 60-61.)  Thus, defendants' position is apparently that Pears was suspended without pay not because he copied Judges Johnston and Graddick on his internal complaint, but because he failed to ask the very people he accused of race discrimination for permission to report their alleged misdeeds to higher authorities.

[7]    More broadly, defendants' evidence is that Chief Collier, Lt. Patterson and Judge Johnston conducted an investigation into Pears' allegations of race discrimination and deemed them "false."  (Johnston Aff., ¶ 2.)

Hummel's head by taking up the matter with Lt. Patterson.  Sgt. Hummel concluded that Pears' attitude "borders on insubordination" and that future disrespectful outbursts "could result in additional disciplinary action up to and including dismissal."  (Plaintiff's Exh. 16.)[8]

On July 31, 2006, less than two months after Pears complained of race discrimination, Sgt. Hummel issued a performance review of Pears for the August 2005 through August 2006 time frame.  This process was unusual, inasmuch as the Department had never before conducted written performance reviews of Pears or his co-workers.  (Pears Dep., at 241; Patterson Dep., at 62.)  Although that evaluation is just one sentence long, it states that Sgt. Hummel rated Pears' performance "unsatisfactory," with no explanatory verbiage.  (Plaintiff's Exh. 17.)  This evaluation was signed by Sgt. Hummel and by Pears, but there is no indication that it was reviewed or approved by anyone else.[9]  The record reflects that no other officer in the Department has ever received an "unsatisfactory" rating.  (Pears Dep., at 241-42; Patterson Dep., at 62; Collier Dep., at 78.)  Moreover, Pears disputes that his performance was, in fact, unsatisfactory during that time period.  (Pears Dep., at 187.)  There is no evidence, however, that this rating was ever used against Pears, or that it had a material adverse effect on Pears' employment.  To the contrary, Judge Graddick, who ultimately was in charge of the Thirteenth Judicial Police Department, testified that he was unaware that performance evaluations were

---

[8]     In an August 1, 2006 letter to Sgt. Hummel, Pears told his side of the story.  In particular, Pears denied having been insubordinate or argumentative, accused Sgt. Hummel of manufacturing "false allegations" against him, and requested that Sgt. Hummel rescind the reprimand and "discontinue this form of harassment."  (Plaintiff's Exh. 18.)

[9]     In his deposition, Lt. Patterson was asked in general terms (without being anchored to any particular time period in Pears' 12-year span of employment) to characterize Pears' performance, to which Lt. Patterson responded, "Professional."  (Patterson Dep., at 12.)  In relying on this testimony, plaintiff overlooks Lt. Patterson's subsequent amplification of this one-word descriptor, that Pears was professional in the sense that he dressed appropriately and was punctual.  However, Lt. Patterson qualified that assessment as follows: "But for his attitude toward supervision, and argumentative.  Very unprofessional."  (*Id.* at 76.)  Lt. Patterson's testimony on this point was reinforced by Chief Collier, who maintained that Pears had an "attitude problem" dating back 13 or 14 years.  (Collier Dep., at 117.)  In the same breath, however, Chief Collier acknowledged that he had never written up Pears for anything during that 13-14 year interval.  (*Id.* at 116-17.)  Of course, all of that changed immediately after Pears complained of race discrimination.

even being done.  (Graddick Dep., at 33.)  Chief Collier explained that the evaluation was placed in Pears' file, but that Pears received no other discipline or stigma as a result of that rating. (Collier Aff., ¶ 6.)

Then, on December 27, 2006, Lt. Patterson issued a "Written Reprimand" to Pears on the grounds that Pears had been "rude, disrespectful and sarcastic to patrons" entering Government Plaza eight days earlier.  (Plaintiff's Exh. 29.)  In the letter, Lt. Patterson cautioned Pears that "negative communications with the public cannot and will not be tolerated" and that "[r]epeated acts of this nature will lead to further disciplinary action to include termination.  (*Id.*)[10]  Pears' evidence, however, is that the incident underlying the December 2006 written reprimand was pure fabrication, and that no unusual events of any kind took place on the day in question. (Pears Dep., at 243-44.)  Indeed, Pears' former co-worker Reginald White testified that he was on duty with Pears at the same post on the date referenced in the reprimand, but that he observed no altercations, confrontations, or other events out of the ordinary.  (White Dep., at 44-45.)[11]

### B.    Termination of Pears' Employment.

On January 4, 2007, all officers of the Thirteenth Judicial Police Department were subjected to a random drug test.  The test originated with Judge Graddick's suggestion to Chief Collier and Lt. Patterson that from a liability and public safety standpoint it would be prudent for the armed court police officers to be screened randomly for drugs.  (Graddick Dep., at 34-35; Graddick Aff., ¶ 3.)  Thus, the decision to test court police officers was Judge Graddick's. (Collier Aff., ¶ 5; Graddick Aff., ¶ 3.)  Pears' sample was found by Community Corrections Center to test positive for benzodiazepine, and subsequent testing by an independent laboratory

---

[10]    Lt. Patterson explained that the genesis of the December 2006 reprimand was a report from Chief Collier that Pears was being rude and disrespectful to patrons as they entered the building.  (Patterson Dep., at 37.)  Upon investigation, Lt. Patterson testified, he found this report to be substantiated.  (*Id.* at 37-38.)  Lt. Patterson acknowledged, however, that he had not documented his investigation, other than the written reprimand letter itself, and that he did not recall with whom he spoke or what he was told in connection with such investigation.  (*Id.* at 38, 40, 46.)  Thus, the only evidence that an investigation was performed at all is Lt. Patterson's conclusory say-so.

[11]    According to White, "I was there that day.  I didn't see nothing that I wouldn't have done, or nobody else wouldn't have done according to that day."  (White Dep., at 44-45.)

in Virginia identified Temazepam as the substance in Pears' system. (Plaintiff's Exh. 31.)[12] The independent lab results were reported back to Pears' supervisors on January 10, 2007. (*Id.*)

Upon receipt of this information, Lt. Patterson and/or Chief Collier apprised Judge Graddick of the situation, and recommended that Pears' employment be terminated because of the positive drug test. (Patterson Dep., at 19, 21; Graddick Dep., at 36.)[13] Judge Graddick agreed that Pears' employment should be terminated based on the positive drug test result. (Graddick Aff., ¶ 5; Collier Dep., at 74.) On that basis, Judge Graddick requested that Chief Collier deliver a resignation letter to Pears and, if Pears refused to resign, that he also be given a termination letter. (Graddick Aff., ¶ 5.) Both letters were on "Thirteenth Judicial Police Department" letterhead, and were signed solely by Chief Collier. (Plaintiffs' Exh. 21.)

---

[12]    The expert report of defendants' pharmacist, Rebecca Mann, Pharm.D., explains the nature and properties of these substances. According to Dr. Mann, benzodiazepines are a class of medications affecting the central nervous system, and are both legend drugs (requiring a prescription) and controlled substances. (Defendants' Exh. 15.) Two types of benzodiazepines are Diazepam (commonly known as Valium) and Temazepam (commonly known as Restoril and used for short-term treatment of insomnia). (*Id.*) Although defendants characterize Dr. Mann's report as "conclusive scientific proof" that Valium could not produce a positive drug test for Temazepam, this contention stretches the report beyond all reason, inasmuch as Dr. Mann is silent on that question. (Doc. 58-2, at 13.)

[13]    Chief Collier denies having made any recommendation concerning termination of Pears' employment based on the drug test results. (Collier Dep., at 73-74.) In fact, Chief Collier's testimony is that he had no contact whatsoever with Judge Graddick concerning the termination decision, and no involvement in that decision. (*Id.* at 77, 85-86, 104.) But a reasonable jury could deem Chief Collier's testimony lacking in credibility on this point. After all, he was Chief of the Department, such that it is highly improbable that he would have no input into the firing of one of his subordinates. Chief Collier wrote and signed detailed termination letters to Pears suggesting intimate knowledge of the decisionmaking process. For his part, Judge Graddick did not recall whether he dealt with Chief Collier, Lt. Patterson, or both on this issue. And defendants contradict their current stance in discovery responses, where they stated that Chief Collier provided information to Judge Graddick concerning the termination, and that Lt. Patterson "did not make the decision, recommend the termination or approve the termination." (Plaintiffs' Exh. 27, at #1 and #2.) Taking reasonable inferences from this record in the light most favorable to Pears, the Court cannot blithely accept Chief Collier's self-serving denial for summary judgment purposes. That said, it is uncontroverted that Chief Collier lacked ultimate authority to hire, fire or suspend Department employees, and that the decisions to suspend and fire Pears for failing the drug test were ultimately made by Judge Graddick. (Collier Aff., ¶ 5.)

The so-called "resignation letter" was dated January 22, 2007 and set forth the following facts: (i) a Department-wide drug test was conducted on January 4; (ii) Pears was instructed to provide documentation concerning all medications he was taking; (iii) Pears' sample had tested positive for Temazepam, a member of the benzodiazepine family and a Schedule IV controlled substance; and (iv) none of the drugs listed in Pears' pharmacy records corresponded with that substance.  Based on these circumstances, Chief Collier's letter continued, Pears' "services with the Thirteenth Judicial Police Department ... must end," although he would be given the option of resigning immediately.  (Plaintiff's Exh. 21.)  Evidently, Pears refused to tender his resignation.  A second letter from Chief Collier dated the same day then notified Pears that "[y]our services with the Thirteenth Judicial Police Department are no longer needed, and you are hereby terminated immediately from your employment as a Court Security Officer."  (*Id.*)  Thus, Pears' employment was terminated on January 22, 2007 for the sole stated reason that he had tested positive for drugs.  (Collier Dep., at 89.)  Indeed, Chief Collier testified that "[i]f it hadn't been for the drug test, Officer Pears would still be working with us."  (*Id.* at 116.)[14]

Pears has never disputed the drug test results.  (Pears Dep., at 56, 116.)  After being discharged, however, Pears sought to exonerate himself by presenting evidence that he was not on drugs at the time of his dismissal.  (Pears Dep., at 255.)  In particular, Pears obtained information from his dentist, David Lairmore, M.D., concerning medications he had been administered during a tooth extraction on December 28, 2006, just days before the drug test.  (*Id.* at 254.)  A handwritten note from a nurse at Dr. Lairmore's office dated January 23, 2007 confirmed that during his December 28 surgery, Pears had been sedated via a combination of Valium (a benzodiazepine) and fentanyl, administered intravenously.  (Plaintiffs' Exhs. 24 & 25.)  Pears submitted this documentation to Chief Collier, Judge Johnston and Judge Graddick (but not Lt. Patterson) as an attachment to a letter on January 25, 2007, explaining that he had been given Valium during his oral surgery, stating that Valium "would test positive for Temazepam," indicating that his pharmacist would not have had a record of the Valium, and

---

[14]      Lt. Patterson testified much the same way.  (Patterson Dep., at 87.)  The record reflects that Pears was the only Thirteenth Judicial Police Department officer ever to be fired for a positive drug test, although another officer resigned after testing positive for marijuana. (Patterson Dep., at 82-83; Graddick Aff., ¶ 4.)

asking that he be returned to duty.  (Plaintiff's Exh. 22.)  Pears sent a follow-up letter to the same

three supervisors on February 1, 2007, appealing to their sense of justice and fairness.

(Plaintiffs' Exh. 23.)

The information Pears provided to Chief Collier, Judge Johnston and Judge Graddick

concerning his medications elicited no response from them, much less an invitation to return to

work.  (Pears Dep., at 255-56.)  Judge Graddick decided that this additional information did not

warrant modification or rescission of the termination decision.  (Collier Dep., at 103-04.)  In his

deposition, Judge Graddick explained his reasoning as follows: "I was told, that the apparent

substance that he was supposed to have been given in the dental surgery ... didn't match the

ingredients of what he had in his system, that it might have been in the same family, but it wasn't

the same. ... He was fired because the drug in his system was not the same as the paperwork he

gave us, nor was it the same as what he was alleged to have gotten in the dental surgery."

(Graddick Dep., at 47-49.)  Judge Graddick testified that "[a]ll of [his] information came from

the chief and the lieutenant."  (*Id.* at 48.)  It is unclear, however, whether any investigation of

Pears' explanation was conducted, or whether there was any factual basis for the apparent

determination that Pears' surgical use of Valium one week before the drug test could not have

produced a positive test result for Temazepam (a benzodiazepine like Valium).[15]  To add further

---

[15]     Pears' dentist, Dr. Lairmore, testified that in connection with the tooth extraction
process, Pears received an intravenous dosage of Valium and fentanyl.  (Lairmore Dep., at 14,
44.)  Dr. Lairmore's testimony was quite clear that he never administered or prescribed
Temazepam (otherwise known as Restoril) to Pears, and that he had no explanation for the
presence of Temazepam in Pears' system on January 4, 2007.  (*Id.* at 23-24.)  Dr. Lairmore
explained that Restoril and Valium have different chemical properties and that their sedative
effects on the body are not exactly the same.  (*Id.* at 55.)  But he also allowed that, in his non-
expert view, there was a "possibility" that the Valium administered during Pears' surgery could
have triggered a positive drug test result for benzodiazepine.  (*Id.* at 40.)  None of this
information is particularly illuminating for summary judgment purposes, of course, without any
indication that Judge Graddick, Judge Johnston, Chief Collier, or their agents made any inquiry
of Dr. Lairmore concerning this topic before rejecting Pears' explanation out of hand.  Today,
defendants make emphatic statements in their briefs, such as "Valium will not test positive for
temazepam."  (Doc. 58-2, at 5.)  But the cited portion of the record does not support that
proposition, and the Court cannot take counsel's word for it.  *See, e.g., Taylor v. Holiday Isle,
LLC*, 561 F. Supp.2d 1269, 1275 n.11 (S.D. Ala. 2008) ("Unadorned representations of counsel
in a summary judgment brief are not a substitute for appropriate record evidence.").  As for

ambiguity, defendants admitted in discovery responses that Pears was discharged because "a random drug test showed that he had an unacceptable level of benzodiazepine in his system" (Plaintiff's Exh. 27, at #3), without distinguishing between Valium (a benzodiazepine as to the presence of which Pears had provided a legitimate explanation) and Temazepam (a benzodiazepine as to which no explanation was provided).

## II.     Summary Judgment Standard.

Summary judgment should be granted only if "there is no issue as to any material fact and the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c).  The party seeking summary judgment bears "the initial burden to show the district court, by reference to materials on file, that there are no genuine issues of material fact that should be decided at trial."  *Clark v. Coats & Clark, Inc.,* 929 F.2d 604, 608 (11th Cir. 1991).  Once the moving party has satisfied its responsibility, the burden shifts to the nonmovant to show the existence of a genuine issue of material fact.  *Id.*  "If the nonmoving party fails to make 'a sufficient showing on an essential element of her case with respect to which she has the burden of proof,' the moving party is entitled to summary judgment."  *Id.*  (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986)) (footnote omitted).  "In reviewing whether the nonmoving party has met its burden, the court must stop short of weighing the evidence and making credibility determinations of the truth of the matter.  Instead, the evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor."  *Tipton v. Bergrohr GMBH-Siegen*, 965 F.2d 994, 999 (11th Cir. 1992) (internal citations and quotations omitted).  "Summary judgment is justified only for those cases devoid of any need for factual determinations."  *Offshore Aviation v. Transcon Lines, Inc.*, 831 F.2d 1013, 1016 (11th Cir. 1987) (citation omitted).[16]

_____

defendants' assertion that "[i]t is an undisputed chemical fact ... that the substance for which he tested positive was neither administered nor prescribed by Dr. Lairmore" (doc. 50-2, at 20), it proves too little.  Defendants point to no evidence that the substance administered by Dr. Lairmore could not have yielded a positive drug test for another substance in the same chemical family.  In any event, the record supports a reasonable inference that the decisionmakers made no effort to obtain information concerning the likelihood that Valium could have produced the positive drug test result before summarily rejecting Pears' explanation.

[16]     At various points in their briefs, defendants attempt to bolster the credibility of their witnesses by characterizing them as a "highly respected and esteemed judicial official" and

The Eleventh Circuit has expressly rejected the notion that summary judgment should seldom be used in employment discrimination cases because they involve issues of motivation and intent. *See Wilson v. B/E Aerospace, Inc.*, 376 F.3d 1079 (11th Cir. 2004). Rather, "the summary judgment rule applies in job discrimination cases just as in other cases. No thumb is to be placed on either side of the scale." *Id.* at 1086 (citation omitted).

## III.    Analysis of Defendant-Specific Issues.

In this litigation, Pears has raised parallel claims of race discrimination and retaliation pursuant to Title VII and 42 U.S.C. § 1983 against Mobile County, 13th Judicial Police Department, and Chief Collier in his official capacity. Also in play is a 42 U.S.C. § 1981 cause of action against Chief Collier in his individual capacity.[17] Defendants maintain that there are insuperable defects in the designation of each named defendant that mandate dismissal of plaintiff's claims against them, as a matter of law, without reaching the merits. The Court takes up these issues first.

### A.    *Status of Plaintiff's Claims against Mobile County and Chief Collier.*

#### 1.    *Mobile County.*

Defendant Mobile County maintains that it is entitled to judgment as a matter of law on all of Pears' claims because it was not his employer. In response, Pears acknowledges that "[a]pparently, the County exercises no control as to the fundamental aspects of Pears [*sic*] employment, including his suspension and discharge. As such, the Plaintiff voluntarily dismisses his Title VII claims against Mobile County." (Doc. 55, at 14.) Plaintiff's admission

---

a "highly respected jurist." (Doc. 50-2, at 20; doc. 58-2, at 8.) As stated *supra*, however, this Court cannot and will not weigh credibility of witnesses in deciding a Rule 56 motion. Irrespective of any witness's stature, occupation or reputation, a defense witness's testimony will not be accepted over conflicting evidence at the summary judgment stage, nor will the Court refrain from drawing reasonable inferences in the plaintiff's favor.

[17]    Plaintiff originally brought § 1981 claims against all defendants; however, the § 1981 claims against all defendants other than Chief Collier in his individual capacity were dismissed via Order (doc. 49) entered on April 13, 2009 on the ground that § 1983 constitutes the exclusive remedy for any § 1981 violations by those defendants. *See, e.g., Baker v. Birmingham Bd. of Educ.*, 531 F.3d 1336, 1337 (11th Cir. 2008) ("Section 1981 does not provide a cause of action against state actors; instead, claims against state actors or allegations of § 1981 violations must be brought pursuant to § 1983.").

that Mobile County is not his employer is fatal to his Title VII claims against it.  *See, e.g.,*
*Dearth v. Collins*, 441 F.3d 931, 933 (11th Cir. 2006) ("relief under Title VII is available against
only the employer"); *Busby v. City of Orlando*, 931 F.2d 764, 772 (11th Cir. 1991) ("relief
granted under Title VII is against the *employer*").  In light of this fact, coupled with Pears' stated
desire to abandon his Title VII claims against Mobile County, the Motion for Summary
Judgment is **granted** in that respect, and plaintiff's Title VII claims against defendant Mobile
County are **dismissed**.[18]

In hoisting the white flag of surrender as to his Title VII claims against Mobile County,
Pears remained silent as to his § 1983 claims against that defendant.  However, nothing in Pears'
Complaint or summary judgment filings suggests that his § 1983 claims are based on anything
other than alleged constitutional and statutory violations in the employment relationship.[19]

_____

[18]     In reaching this conclusion, the Court does not adopt defendants' oft-repeated
assertion that *Lee v. Mobile County Commission*, 954 F. Supp. 1540 (S.D. Ala. 1995), constitutes
"binding precedent" in this action.  (Doc. 50-2, at 8, 11.)  It is black-letter law that the decision
of one federal district court is not binding on another federal district court, or even on the same
judge in another case.  *See, e.g., McGinley v. Houston*, 361 F.3d 1328, 1331 (11th Cir. 2004) ("a
district judge's decision neither binds another district judge nor binds him"); *Garcia v. Tyson
Foods, Inc.*, 534 F.3d 1320, 1329 (10th Cir. 2008) ("it is clear that there is no such thing as the
law of the district") (citation omitted); *Irvine v. 233 Skydeck, LLC*, 597 F. Supp.2d 799, 803
(N.D. Ill. 2009) ("decisions of other district courts are entitled to no more weight than their
intrinsic persuasiveness merits") (citation omitted); *Chavez v. Board of Educ. of Tularosa
Municipal Schools*, 614 F. Supp.2d 1184, 1231 (D.N.M. 2008) ("district court opinions are not,
as a matter of law, binding authorities except on the parties"); *FC Investment Group LC v.
Lichtenstein*, 441 F. Supp.2d 3, 9 n.3 (D.D.C. 2006) ("one district court decision is not binding
on another district court") (citation omitted).  Besides, a close reading of *Lee* reveals that the
basis for Judge Hand's finding that a court security guard was not an employee of Mobile
County was that the plaintiff "presented no evidence to establish that the Mobile County
Commission is her 'employer' as that term is defined under Title VII."  *Lee*, 954 F. Supp. at
1546.  Being factbound by the plaintiff's meager evidentiary submission, *Lee* can hardly be
viewed as a definitive pronouncement as to the employing entity of Thirteenth Judicial Police
Department officers as of 2006 and early 2007, when Pears was disciplined and fired.
Defendants' contention to the contrary amounts to overreaching.

[19]     Indeed, Pears states in his brief that he is asserting "§ 1983 claims for race
discrimination and retaliation against his employer alleging that his employer has discriminated
against him in the making and enforcement of contracts and in violation of the equal protection
clause which also prohibits racial discrimination and retaliation."  (Doc. 55, at 15.)  Given Pears'

Stated differently, Pears' § 1983 claims allege that his suspension, performance evaluation, and discharge were in violation of his § 1981 right to be free from discrimination in the making and enforcement of contracts, as well as his equal protection right to be free from racial discrimination and retaliation.  He has identified no facts suggesting that defendant Mobile County had anything to do with these alleged deprivations, and all record evidence is to the contrary.  It is uncontroverted that Mobile County did not direct, control or supervise the operations of the Thirteenth Judicial Police Department.  (Pafenbach Dep., at 35-36; Pafenbach Aff., ¶ 3.)  As such, defendant Mobile County can have no liability under § 1983 for plaintiff's claims of equal protection and § 1981 violations predicated on adverse employment actions taken while he worked for an entity that was beyond the control and supervision of Mobile County.  For that reason, the Motion for Summary Judgment is **granted** as to all § 1983 claims asserted against Mobile County, and those causes of action are **dismissed** because the record in the light most favorable to Pears establishes no genuine issues of material fact that Mobile County did or failed to do anything to cause the alleged violations and deprivations on which such § 1983 claims hinge.

2.      *Chief Collier.*

Pears' pending claims against Chief Collier consist of the following: (a) Title VII claims against him in his individual and official capacities; (b) Section 1983 claims against him in his official capacity for violations of § 1981 and the equal protection clause; and (c) a Section 1981 claim against him in his individual capacity.

Defendants are correct that Pears cannot sustain an individual-capacity Title VII claim against a supervisory employee, as a matter of law.  *See, e.g., Dearth*, 441 F.3d at 933 ("we now expressly hold that relief under Title VII is available against only the employer and not against individual employees whose actions would constitute a violation of the Act"); *Edwards v. Wallace Community College*, 49 F.3d 1517, 1520 n.3 (11th Cir. 1995) (noting that individual capacity suits under Title VII are inappropriate).  In pleading those claims, the Complaint alleged that Chief Collier was Pears' "joint employer."  On summary judgment, however, plaintiff backs

acknowledgment that Mobile County was not his employer, he could not possibly maintain viable § 1983 claims against it on these theories.

off that contention, identifying neither facts nor law that could support such a designation of Chief Collier, much less enable him to surmount the general prohibition on individual-capacity Title VII claims against supervisors. Accordingly, plaintiff's Title VII claims against Chief Collier in his individual capacity fail as a matter of law, and are properly **dismissed** at this time.

Plaintiff's official-capacity Title VII claims against Chief Collier stand on a different footing. The Eleventh Circuit has authorized Title VII claims against supervisors in their capacity as agents of the employer (*i.e.*, in their official capacity). *See, e.g., Hinson v. Clinch County, Georgia Bd. of Educ.*, 231 F.3d 821, 827 (11th Cir. 2000) ("The only proper individual defendants in a Title VII action would be supervisory employees in their capacity as agents of the employer."). Defendants recognize this principle, but emphasize case authorities holding that an official-capacity suit against an individual defendant is redundant when the employer has already been named as a defendant. *See, e.g., Portera v. State of Ala. Dep't of Finance*, 322 F. Supp.2d 1285, 1287 (M.D. Ala. 2004) (any Title VII claim against governmental supervisor "in his official capacity is redundant since the Finance Department is already a defendant"). But this line of authorities actually works against defendants here. Defendants' position is that Pears' employer (Thirteenth Judicial Circuit of Alabama) was <u>not</u> separately named as a defendant; therefore, there is no redundancy, and the Title VII official-capacity claims against Chief Collier are not precluded on the basis of *Portera*-style reasoning.

With respect to the § 1983 claims, defendants' first argument is that "[w]hen individual state actors are defendants, the § 1983 claims are for prospective injunctive relief only." (Doc. 50-2, at 17 (emphasis omitted).) Plaintiff has not challenged defendants' contention that Chief Collier qualifies as a state actor for § 1983 purposes; therefore, the Court will refrain from *sua sponte* analysis of that often-technical and complex question.[20] But defendants' suggestion that the only viable § 1983 claims against state actors are for prospective injunctive relief would

---

[20]     *See, e.g., Manders v. Lee*, 338 F.3d 1304, 1308-09 (11th Cir. 2003) (setting forth and applying legal test for determining whether individual defendant is entitled to Eleventh Amendment immunity for official-capacity § 1983 claims); *Lancaster v. Monroe County, Ala.*, 116 F.3d 1419, 1429 (11th Cir. 1997) (engaging in detailed analysis to determine whether defendant in § 1983 action qualifies as "state official" protected by Eleventh Amendment immunity).

obliterate the distinction between official-capacity claims and individual-capacity claims.  Of course, Eleventh Amendment immunity does nothing to shield a state official from liability for damages under § 1983 in his individual capacity.  *See, e.g, Cross v. State of Ala., State Dep't of Mental Health & Mental Retardation*, 49 F.3d 1490 (11th Cir. 1995) ("Nor does the Eleventh Amendment preclude a damages award against [state officials] in their individual capacities pursuant to section 1983"); *Jackson v. Georgia Dep't of Transp.*, 16 F.3d 1573, 1575 (11th Cir. 1994) ("the Eleventh Amendment does not protect state employees sued in their individual capacity for employment-related acts").  As such, to the extent that Chief Collier would invoke Eleventh Amendment immunity to defeat the § 1983 claims against him in his individual capacity, that argument is meritless.

That said, the Court agrees with Chief Collier that the Eleventh Amendment bars Pears' § 1983 claims against him in his official capacity.  After all, "[i]n the absence of consent, a suit in which the State or one of its agencies or departments is named as the defendant is proscribed by the Eleventh Amendment."  *Manders v. Lee*, 338 F.3d 1304, 1308 n.8 (11th Cir. 2003) (citation omitted).  No such consent or abrogation of Eleventh Amendment immunity has occurred in the § 1983 context.  *See, e.g., Schopler v. Bliss*, 903 F.2d 1373, 1379 n.4 (11th Cir. 1990) ("The Fourteenth Amendment does not by its own force override the States' Eleventh Amendment immunity, ... nor did Congress abrogate that immunity when it enacted 42 U.S.C. § 1983") (internal citations omitted).[21]  Moreover, "[t]he state need not be formally named as a defendant for the amendment to apply; state officials sued in their official capacity are also protected by the amendment."  *Harbert Int'l, Inc. v. James*, 157 F.3d 1271, 1277 (11th 1998); *see also Summit Medical Associates, P.C. v. Pryor*, 180 F.3d 1326, 1336 (11th Cir. 1999) ("the Eleventh Amendment prohibits suits against state officials where the state is, in fact, the real party in interest"); *Jackson*, 16 F.3d at 1575 ("state officials sued for damages in their official capacity

_____

[21]     The same is not true under Title VII, and the law is quite clear that states and state officials do not enjoy Eleventh Amendment immunity as to Title VII claims.  *See, e.g., Cross*, 49 F.3d at 1502 ("It is undisputed that the Eleventh Amendment does not bar appellees' Title VII suit."); *Allen v. Alabama State Bd. of Educ.*, 816 F.2d 575, 577 (11th Cir. 1987) ("We agree and hold that, in civil actions invoking Title VII, state defendants lack eleventh amendment protection").

are immune from suit in federal court").  Pears has identified no colorable basis for circumventing the prohibition on his § 1983 claims against Chief Collier in his official capacity; therefore, those claims are **dismissed** pursuant to Eleventh Amendment immunity.[22]

With respect to the § 1983 causes of action against Chief Collier in his individual capacity, defendants trot out a pair of underdeveloped, perfunctory defenses.  First, defendants devote a single sentence to the proposition that Chief Collier is entitled to qualified immunity, without expounding on the legal or factual basis for such a contention.  When a government official is sued in his individual capacity for money damages for alleged civil rights violations, he may posit an affirmative defense of qualified immunity.  *See Swint v. City of Wadley, Ala.*, 51 F.3d 988, 994 (11th Cir. 1995).  "To receive qualified immunity, the officer must first show that he acted within his discretionary authority."  *Lewis v. City of West Palm Beach, Fla.*, 561 F.3d 1288, 1291 (11th Cir. 2009).  Chief Collier has offered neither evidence nor argument on this point, and the Court will not "fill in the blanks" by formulating his arguments or presenting his proof for him as to this affirmative defense.[23]  Second, defendants advance an ill-conceived

---

[22]      There is some suggestion in the briefs that Pears' § 1983 claims against Chief Collier in his official capacity should survive to the extent that they seek prospective injunctive or declaratory relief.  The legal principles underlying such a contention are firmly established.  Even in the official-capacity realm, Eleventh Amendment immunity does not insulate state officials from suits "seeking *prospective* equitable relief to end *continuing* violations of federal law."  *Summit Medical*, 180 F.3d at 1336; *see also Friends of Everglades v. South Florida Water Management Dist.*, --- F.3d ----, 2009 WL 1545551, *3 (11th Cir. June 4, 2009) (recognizing "exception to Eleventh Amendment immunity for lawsuits against state officials as long as the plaintiffs seek only prospective injunctive relief to stop ongoing violations of federal law").  Pears' problem, however, is that the record is devoid of evidence of a continuing violation of federal law by defendants; rather, his requests for reinstatement and other prospective relief are hinged exclusively on discrete acts that occurred in 2006 and early 2007, rather than any ongoing, continuing malfeasance today.  There is no evidence that, for example, Pears has ever applied for reinstatement at the Thirteenth Judicial Police Department, or that such application has been denied for discriminatory or retaliatory reasons.  Plaintiff's attempt (with no citations to authority of any kind) to expand the prospective injunctive relief exception to Eleventh Amendment immunity to encompass a suit where prospective injunctive relief is sought solely to remedy a one-time past deprivation is improper and untenable.  *See Summit Medical*, 180 F.3d at 1336 ("a plaintiff may not use the doctrine to adjudicate the legality of past conduct").

[23]      Besides, the Court cannot find as a matter of law that Chief Collier is entitled to qualified immunity without examining the merits of the case.  Assuming Chief Collier can

-17-

argument that the § 1983 claims against Chief Collier in his individual capacity are precluded by his retirement following the filing of this lawsuit.  It is true enough that § 1983 claims generally do not reach private conduct.  *See, e.g., Weaver v. James Bonding Co.*, 442 F. Supp.2d 1219, 1223 (S.D. Ala. 2006) ("the under-color-of-state-law element of § 1983 excludes from its reach merely private conduct") (citation omitted).  But Pears is not suing Chief Collier for post-retirement private conduct; rather, he is suing Chief Collier for allegedly discriminatory and retaliatory actions he took during the course of his employment as Chief of the Thirteenth Judicial Police Department.  The "private conduct" limitation on § 1983 claims has absolutely no application here, and defendants' facile contention to the contrary borders on the absurd.[24]

---

satisfy the discretionary function requirement, "a plaintiff seeking to overcome the defendant's privilege of qualified immunity must show (1) that the officer violated her federal constitutional or statutory rights, and (2) that those rights were clearly established at the time the officer acted." *Douglas Asphalt Co. v. Qore, Inc.*, 541 F.3d 1269, 1273 (11th Cir. 2008).  Unquestionably, the right of a government employee to be free from race discrimination and retaliation for having complained of racially discriminatory treatment in the workplace was clearly established at all relevant times.  *See, e.g., Rioux v. City of Atlanta, Ga.*, 520 F.3d 1269 (11th Cir. 2008) (stating that "we can all agree" with the proposition that "the right to be free from employment discrimination was clearly established"); *Alexander v. Fulton County*, 207 F.3d 1303, 1321 (11th Cir. 2000) ("[T]here can be no doubt that ... it was clearly established that intentional discrimination in the workplace on account of race violated federal law."); *Andrews v. Lakeshore Rehabilitation Hosp.*, 140 F.3d 1405, 1412-13 (11th Cir. 1998) (recognizing that § 1981 prohibits retaliation against employees for making complaints of racially discriminatory treatment in the workplace).  In a more fact-specific context, it was likewise clearly established at all relevant times that suspending an employee because he complained about race discrimination, and firing an employee for reasons of race discrimination and retaliation, violated federal law.  As such, Chief Collier's eligibility for qualified immunity turns on whether he did or did not participate in adverse actions against Pears because of his race and in retaliation for complaints of discrimination.  That inquiry collapses into an ordinary merits analysis, and will be addressed *infra*, rather than here in the specific framework of the qualified immunity defense.  The point is that Chief Collier is not entitled to summary judgment on the § 1983 individual capacity claims, independent of a merits assessment of the evidence in the summary judgment record as to whether he participated in violations of Pears' federal constitutional or statutory rights.

[24]       The same goes for defendants' variant of the argument, to-wit: that Chief Collier "in his individual capacity was neither a state actor nor acting under color of state law," such that he cannot be liable under § 1983.  (Doc. 50-2, at 19.)  Were it true that defendants in their individual capacities are, by definition, not acting under color of state law, then individual-capacity suits under § 1983 would be categorically foreclosed in all cases.  Of course, that is not

In sum, then, Pears' Title VII claim against Chief Collier in his individual capacity and his § 1983 claim against him in his official capacity are **dismissed** for the reasons set forth above.  The remaining claims against him (Title VII official capacity, § 1983 individual capacity, and § 1981 individual capacity) are not defeated by the various immunities and affirmative defenses recited in defendants' summary judgment briefs, but will be evaluated on the merits.

> **B.**     ***Status of Plaintiff's Claims against 13th Judicial Police Department.***

A critical preliminary issue on summary judgment is whether Pears has properly named as a defendant the entity that employed him and, if not, whether he may amend his pleadings now to correct that defendant's name.

> *1.*     <u>*The Correct Name is Thirteenth Judicial Circuit of Alabama.*</u>

The Complaint (doc. 1) names as defendants Mobile County, 13th Judicial Police Department and James Collier, individually and in his official capacity.  As discussed *supra*, everyone now agrees that Mobile County was not Pears' employer, and Pears has abandoned his earlier position that Chief Collier was his joint employer for Title VII purposes.  Thus, plaintiff has pegged "13th Judicial Police Department" as the entity that employed and fired him, and as the employer defendant against which his Title VII claims and the bulk of his § 1983 claims are directed.  The court file reflects that Pears served process on the 13th Judicial Police Department by that name on July 11, 2008, via certified mail addressed to Judge Johnston at Government Plaza, the building that houses both the Department and the Mobile County Circuit Court.  (*See* doc. 4.)  On July 30, 2008, an Answer (doc. 8) was filed in this case by an entity calling itself "The 13th Judicial Circuit Police Department," which was represented by the same counsel that appeared on behalf of Mobile County and Chief Collier.  Nowhere in that Answer did counsel posit that this defendant did not exist, that it had not properly been served with process, or that Pears had somehow incorrectly named it (other than the Answer's addition of the words "The"

---

the law, and defendants have failed to provide any legal or analytical basis for overturning decades of well-entrenched § 1983 jurisprudence with the stroke of a pen.

and "Circuit" in that defendant's name).[25]

Defendants assert that, with respect to named defendant 13th Judicial Police Department, "[t]here is no such legal entity subject to suit or capable of filing suit."  (Doc. 50-2, at 11.) Defendants fail to explain how an entity that does not exist could possibly have filed an Answer and actively defended itself in these proceedings for a year.  Nonetheless, uncontroverted evidence establishes that "[t]here is no such entity as the Thirteenth Judicial Police Department." (Collier Aff., ¶ 2; *see also* Graddick Aff., ¶ 2.)  Defendants' evidence is that "[e]mployees of the police department of the 13th Judicial Circuit of Alabama are at-will employees of the 13th Judicial Circuit of Alabama.  The 13th Judicial Police Department exists in name only and is not an entity subject to suit."  (Graddick Aff., ¶ 2.)  Judge Graddick's statements are echoed by John Pafenbach, County Administrator for Mobile County, who avers that court police officers such as Pears "have always been employed by the Thirteenth Judicial Circuit of Alabama, which is a separate legal entity and a subsidiary of the State."  (Pafenbach Aff., ¶ 2.)  Chief Collier signed an affidavit with similar averments.  (Collier Aff., ¶ 3.)  It appears, then, that the correct name of the entity that employed Pears is "Thirteenth Judicial Circuit of Alabama," not the named defendant "13th Judicial Police Department."

### 2. *Plaintiff's Request to Substitute the Correct Name of This Defendant.*

Faced with this evidence on a Rule 56 motion, plaintiff identifies no facts suggesting that the proper name of the employing entity is actually 13th Judicial Police Department.  Instead, plaintiff cavalierly invites the Court (without a single citation to authority) to substitute Thirteenth Judicial Circuit of Alabama for existing defendant 13th Judicial Police Department if the Court decides that the former name is correct.  The sum total of plaintiff's reasoning on this

---

[25]  Nearly five months later, in December 2008, after the applicable deadline for amending pleadings had expired, defendants filed a Motion to Dismiss alleging for the first time that "The 13th Judicial Police Department exists in name only" and that Pears "was at all relevant times an employee of the 13th Judicial Circuit Court."  (Doc. 18, at 1-2.)  In that Motion, defendants wrote as to the 13th Judicial Police Department that "[t]here is no such entity."  (*Id.* at 3.)  Such a contention is remarkable in light of the fact that an Answer was filed in July 2008 by an entity calling itself "The 13th Judicial Circuit Police Department."  Defendants have not explained how an entity that does not exist appeared and filed a responsive pleading using a variant of that name.

point is that "it makes no difference to the Plaintiff" which name is used for his employer, as well as a blanket statement (with no elaboration) that "defendant would suffer no prejudice from this substitution." (Doc. 55, at 15.) Defendants decry plaintiff's proposal and insist that the Thirteenth Judicial Circuit of Alabama would be unduly prejudiced by the proposed substitution because "neither this subsidiary of the State of Alabama nor the State of Alabama have participated in discovery, pleadings, motions or any other aspect of this case." (Doc. 58-2, at 6.) Defendants also suggest that plaintiff is the author of his own misfortune, inasmuch as he "has always known" the identity of "the proper entity who was his employer." (*Id.*)[26] Unhelpfully, neither side offers any legal framework or cogent analysis by which to evaluate their conclusory contentions concerning whether Pears can or cannot modify the name of a defendant at this time to reflect its true identity.[27]

    The starting point of the Court's analysis is the so-called "misnomer rule," which

---

[26]    On its face, this argument strikes a false note. In stating this proposition defendants cite Pears' deposition testimony that his employer was "the 13th Judicial Court System." (Pears Dep., at 33.) But that name does not match the correct entity name presented by defendants on summary judgment. The Court has no reason to believe that plaintiff would have fared any better by suing "the 13th Judicial Court System" than he did by suing "13th Judicial Police Department," if the latter designation was not sufficient to bring the correctly named entity (Thirteenth Judicial Circuit of Alabama) into this action. Either way, it appears that defendants would be seeking summary judgment on the same grounds, namely, that the employer was not properly named in the Complaint.

[27]    The Court expressly "decline[s] to assume the role of counsel and make a new argument for" the parties. *See, e.g., United States v. Docampo*, --- F.3d ----, 2009 WL 1652910, *11 (11th Cir. June 15, 2009); *see also Lyes v. City of Riviera Beach, Fla.*, 126 F.3d 1380, 1388 (11th Cir. 1997) ("[t]here is no burden upon the district court to distill every potential argument that could be made based upon the materials before it on summary judgment. Rather, the onus is upon the parties to formulate arguments ....") (citation omitted); *Pinto v. Universidad De Puerto Rico*, 895 F.2d 18, 19 (1st Cir. 1990) ("the court is under no duty to exercise imagination and conjure what a plaintiff might have alleged, but did not, and do counsel's work for him or her"); *Fisher v. Ciba Specialty Chemicals Corp.*, 238 F.R.D. 273, 299 n.57 (S.D. Ala. 2006) (where parties have not articulated a theory for liability, "the Court will not formulate their arguments for them"). The parties having chosen not to brief this issue thoroughly, they cannot be heard to balk if the undersigned does not perform their research and develop their arguments for them. Thus, the parties' decision to give short shrift to their treatment of the misnomer / amendment issue is at their peril.

generally allows for correction of a defendant's name pursuant to Rule 15 at any time where a plaintiff has sued a defendant by an incorrect name.  "'Misnomer' denotes the case in which the plaintiff has the wrong name of the right party, while in a case of mistaken identity the plaintiff has named the wrong party. ... [A] misnomer can be corrected at any time, provided that the plaintiff serves the defendant with reasonable promptness."  *Athmer v. C.E.I. Equipment Co.*, 121 F.3d 294, 296 (7th Cir. 1997); *see also Roberts v. Michaels*, 219 F.3d 775, 777-78 (8th Cir. 2000) (pointing out "well-recognized distinction between a complaint that sues the wrong party, and a complaint that sues the right party by the wrong name," and finding that district court erred by not allowing plaintiff to correct misnomer by amendment); *Morrel v. Nationwide Mut. Fire Ins. Co.*, 188 F.3d 218, 224 (4th Cir. 1999) ("As a general rule the misnomer of a corporation in a notice, summons ... or other step in a judicial proceeding is immaterial if it appears that [the corporation] could not have been, or was not, misled.") (citation omitted); *Datskow v. Teledyne, Inc., Continental Products Div.*, 899 F.2d 1298, 1302-04 (2nd Cir. 1990) (reversing lower court with instructions to allow plaintiff to amend complaint to name proper defendant where plaintiff had simply "mislabeled" defendant which conducted business under confusingly similar name to that of parents and affiliates, and correct defendant was on notice of proceedings); *Flynn v. Best Buy Auto Sales*, 218 F.R.D. 94, 97 (E.D. Pa. 2003) ("misnomer rule" may be used to correct name of defendant where plaintiff "has actually sued and served the correct party but has mistakenly used the wrong name of the defendant in the original caption," so long as "it would be reasonable to conclude that plaintiff had in mind the proper entity or person, merely made a mistake as to the name, and actually served the entity or person intended") (citation omitted).

Simply put, then, "Rule 15 allows amendment of a claim, changing either party provided that the defendant will not be prejudiced in maintaining a defense on the merits and knows or should have known that but for a mistake concerning the identity of the proper party, the action would have been brought against the proper party. ... [T]he purpose of the rule is to prevent parties against whom claims are made from taking unjust advantage of otherwise inconsequential pleading errors."  *Marco's Franchising, LLC v. Marco's Italian Exp., Inc.*, 239 F.R.D. 686, 687 (M.D. Fla. 2007); *see also* Rule 15(c), Fed.R.Civ.P., Advisory Committee Notes 1991 Amendment ("An intended defendant who is notified of an action within the period allowed ... for service of a summons and complaint may not under the revised rule defeat the action on

-22-

account of a defect in the pleading with respect to the defendant's name .... [A] complaint may be amended at any time to correct a formal defect such as a misnomer or misidentification.").

In accordance with these principles, federal courts "have consistently held that mistakenly failing to sue the proper party does not itself constitute the kind of circumstance which would permit denial of leave to amend," inasmuch as that kind of mistake is "nothing more than a remedial pleading defect." *Ynclan v. Department of Air Force*, 943 F.2d 1388, 1391 (5th Cir. 1991) (citations omitted); *see generally Diaz v. Shallbetter*, 984 F.2d 850, 856 (7th Cir. 1993) (explaining that the law "does not care whether the complaint gets the defendant's name right" so long as "the right person receives service promptly"). Indeed, courts have routinely allowed a plaintiff to correct his pleadings under Rule 15 to designate a defendant's name properly, provided that the defendant has notice of the proceedings and knows or should know that the action was being brought against it.[28]

This case is one in which misnomer principles apply. In naming 13th Judicial Police Department as the defendant employer, Pears did not sue the wrong entity; rather, he sued the right defendant (Thirteenth Judicial Circuit of Alabama) by the wrong name because of a mistake. Thirteenth Judicial Circuit of Alabama was clearly on notice that he was trying to bring

---

[28]     *See, e.g., Delvecchio v. Smith*, 558 F. Supp.2d 1243, 1245 (S.D. Fla. 2008) (allowing plaintiffs who sued Internal Revenue Service agent to substitute United States as proper party defendant); *Factory Mut. Ins. Co. v. Bobst Group, Inc.*, 319 F. Supp.2d 880, 881-82 (N.D. Ill. 2004) (third-party plaintiff sued non-existent entity, "Factory Mutual Research Center," and was allowed to amend pleading to name correct third-party defendant, "Factory Mutual Research Corporation," where correctly named defendant was aware of claims and had received service); *Miller v. Northwest Region Library Bd.*, 348 F. Supp.2d 563, 567 (M.D.N.C. 2004) (authorizing plaintiff to amend pleadings to name "Board of Directors of Northwestern Regional Library" as defendant, rather than previously named "Northwest Region Library Board," where error was a simple misnomer and defendant "clearly had notice of this action and should have known that the action was brought against" it); *Parker v. District of Columbia*, 216 F.R.D. 128, 130 (D.D.C. 2002) (allowing plaintiff to amend Title VII complaint to substitute District of Columbia as defendant for previously-named District of Columbia Commission on Mental Health Services, where District of Columbia could not reasonably claim prejudice because "it knew all along that the plaintiff intended to sue" it); *Gowins v. Greiner*, 2002 WL 1770772, *2 (S.D.N.Y. July 31, 2002) (allowing plaintiff to amend complaint to substitute New York State Department of Correctional Services as a defendant for State of New York, without materially changing basic factual allegations or claims for relief).

suit against it; indeed, service was perfected on behalf of the named defendant via Judge Johnston, a Thirteenth Judicial Circuit Judge and the Director of the Thirteenth Judicial Police Department. Any reasonable defendant reviewing the Complaint would have recognized that Pears had simply made a mistake and mislabeled the defendant's name; therefore, it cannot reasonably be suggested (and defendants do not argue) that the correct defendant lacked notice of these proceedings.

In opposing the requested amendment, however, defendants insist that there was no mistake, inasmuch as Pears "has always known ... the proper entity who was his employer." (Doc. 58-2, at 6.) This statement is simply untrue.[29] Pears' confusion as to the correct name of his employer is palpable and obvious. For example, in his deposition, Pears testified that, if asked on a hypothetical loan application form, he would have listed his employer as "13th Judicial Police Department." (Pears Dep., at 34.) Moments earlier, Pears had testified that he understood his employer to be "13th Judicial Court System." (*Id.* at 33.) Of course, neither appellation is correct.[30] Pears' confusion was not without reasonable basis in the record. For example, Chief Collier's letter to Pears advising him that he would be discharged unless he resigned was issued on "Thirteenth Judicial Police Department" letterhead, depicted the seals of both Mobile County and the State of Alabama, and made references to "employees of the

_____

[29]    For starters, defendants' stance that the identity of Pears' employer was always clear is undermined by inconsistencies between defendants' evidence that the employing entity was the "Thirteenth Judicial Circuit of Alabama" (Graddick Aff., ¶ 2; Collier Aff., ¶ 3) and defendants' repeated assertions in summary judgment briefs that Pears was employed by "the Thirteenth Judicial Circuit Court." (Doc. 50-2, at 2, 3, 8-10.) If defendants repeatedly misidentify the employing entity in their own summary judgment briefs directed to that precise issue, then it is no wonder that plaintiff was confused on that point for much of this litigation.

[30]    To be sure, on June 30, 2006, Pears set forth in writing his understanding that he was employed by "13th Judicial Circuit Court." (Plaintiff's Exh. 15.) But a letter that he apparently sent to the EEOC in August 2006 identified his employer as "The Thirteenth Judicial Circuit Police Department." (Plaintiff's Exh. 19.) And plaintiff's uncertainty as to the proper name of his employer persisted well into the lifespan of this lawsuit. For example, during Lt. Patterson's deposition in March 2009, plaintiff's counsel candidly stated, "I've sued several entities because, quite frankly, I don't know who the Title [VII] employer is." (Patterson Dep., at 98.) In light of these facts, defendants' position that Pears "has always known" the correct name of his employer is disingenuous.

Thirteenth Judicial Police Department" and Pears' "services with the Thirteenth Judicial Police Department." (Plaintiff's Exh. 21.)[31]  The published discrimination policy stated that "[t]he Thirteenth Judicial Police is an Equal Opportunity Employer." (Plaintiff's Exh. 8.)  And one of Pears' former co-workers, Reginald White, testified that the name of his employer was "13th Judicial Police Department." (White Dep., at 40.)

The picture was further muddied in discovery when John Pafenbach, Mobile County's Administrator and evidently its Rule 30(b)(6) deponent, testified that the Title VII employer for Pears and other courtroom police officers was "the presiding judge," meaning Judge Graddick. (Pafenbach Dep., at 11-12.)  Pafenbach also acknowledged that Pears and other court police officers are paid by Mobile County, that Mobile County makes pension contributions and health insurance payments on their behalf, that they work in a Mobile County-owned building, and that Mobile County supplies them with uniforms, badges, radios and a designated vehicle. (*Id.* at 10, 12-14.)  Pafenbach explained that there is a line item in the County budget for "13th Judicial Police" and that the County appropriates funds for that entity. (*Id.* at 18-19.)  Given the pervasive murkiness surrounding the correct identity of Pears' employer that lingered throughout much of the discovery process, the Court readily finds that the mislabeling of the defendant was a product of a *bona fide* mistake by the plaintiff.[32]

Not only was Pears in the dark as to the correct name of his employer, but defendants bear substantial responsibility for leading Pears away from the light switch.  The Answer (doc.

---

[31]    Strangely, the bottom of that letter reproduces, in letterhead style, the name and mailing addresses of a local law firm that does not represent any of the parties herein. (Plaintiff's Exh. 22.)  The parties have not explained this oddity in the summary judgment record or the connection of that law firm to these proceedings.

[32]    Of course, to say that plaintiff made a mistake in naming the correct defendant is not to say that he did everything he possibly could to determine the proper name of that party once this lawsuit got underway.  By the latter yardstick, the efforts of plaintiff's counsel certainly are not beyond reproach.  But the law does not judge the adequacy of plaintiff's efforts to ascertain the correct name of his employer by such a rigorous standard. *See, e.g., Roberts*, 219 F.3d at 779 (allowing amendment of complaint to correct defendant's name even though "[a] more thorough inquiry might have uncovered" the proper designation of defendant earlier); *Schediecker v. Arvig Enterprises, Inc.*, 193 F.R.D. 630, 633 (D. Minn. 2000) ("In short, we look for 'good cause,' not for 'superlative cause.'").

8) filed by something called "The 13th Judicial Circuit Police Department" (by and through the same attorneys representing Mobile County and Chief Collier) was misleading and lulled plaintiff into thinking that he had named the correct defendant.  Nowhere does that defendant's Answer suggest that Pears had mislabeled the defendant.  Moreover, the Court is at a loss to understand why and how that Answer could have been filed in conformity with counsel's Rule 11 obligations if, as counsel now insists, "[t]here is no such entity as the Thirteenth Judicial Police Department."  (Collier Aff., ¶ 2; *see also* Graddick Aff., ¶ 2.)[33]  If that entity does not exist, then how could it have filed an Answer?  If (as seems reasonable) a nonexistent entity was incapable of filing an Answer, then who or what filed an Answer purporting to be "The 13th Judicial Circuit Police Department"?[34]  Nor is defendants' role in the confusion confined to the Answer.  During Pears' deposition on December 29, 2008, defense counsel asked questions suggesting that the 13th Judicial Police Department was, in fact, Pears' employer, such as "Do you remember when you were hired by the 13th Judicial Police Department?" (Pears Dep., at 34.)  Such questions are irreconcilable with defendants' position on summary judgment, and served to exacerbate the confusion as to the proper name of the employing entity.  By all appearances, the first time defendants pointed out Pears' mislabeling of the employing entity was in a Motion to Dismiss filed a month after the Rule 16(b) deadline for amending pleadings or joining parties.  (*See* docs. 15, 18.)

Not surprisingly, federal courts have frowned on this sort of hide-the-ball approach.  For example, in *Barrett v. Qual-Med, Inc.*, 153 F.R.D. 653 (D. Colo. 1994), the plaintiff brought an ADEA action against Qual-Med, Inc., when the correct name for the employing entity was Qual-Med Plans for Health, Inc.  Qual-Med, Inc. answered the complaint without giving the plaintiff

---

[33]    In summary judgment briefing, defendants emphatically state that "[i]t is undisputed that the alleged defendant '13th Judicial Police Department' does not exist."  (Doc. 58-2, at 16.)  Yet the same lawyers who penned that sentence had previously filed an Answer in this District Court purporting to be by and on behalf of that nonexistent entity, without ever breathing a whisper that their client was illusory.

[34]    Presumably, Mobile County did not answer on this defendant's behalf.  After all, defendants' own witness unequivocally explained that the County does not control or supervise the 13th Judicial Police Department.  (Pafenbach Dep., at 35-36.)

any notice that it was not the correct defendant, and misled the plaintiff in other respects as the litigation wore on, then sought dismissal on the eve of trial on the ground that the wrong defendant had been named.  The *Barrett* court was sharply critical of this tactic, explaining as follows:

> "Of course the normal, and decent, procedure in situations such as this is to raise the matter by a telephone call notifying opposing counsel that she has sued the wrong entity, so that a correction can be made with a minimum of wasted time and expense.  Absent decency, at least the issue should be promptly and clearly raised by a timely motion to dismiss.  Neither of those steps occurred here."

*Barrett*, 153 F.R.D. at 655.  The same is true in the case at bar.  Moreover, the court in *Barrett* decried the defendant's strategy as "hardball tactics," "the very kind of litigation by technicality the Federal Rules of Civil Procedure were adopted to preclude," and antithetical to the expressed aims of Rule 1, Fed.R.Civ.P.  *Id.*  For those reasons, the plaintiff was allowed to amend the complaint, despite the untimeliness of the request, to name the defendant by its proper name. *Barrett* is not unique in its reasoning or result.[35]  Upon consideration, the Court agrees with the *Barrett* line of authorities.  It would be manifestly unjust to preclude Pears from correcting the misnomer in his Complaint that defendants concealed from him until after the deadline for amending pleadings had passed.

Defendants' other arguments against allowing the amendment are unpersuasive.  Although defendants protest that an amendment now would be untimely, other courts have

---

[35]     *See, e.g., Roberts*, 219 F.3d at 779 (finding good cause to allow Title VII plaintiff who did not name employer/defendant correctly to amend under misnomer principle where defendant "created the potential for confusion" by doing business under a fictitious name, "compounded the confusion" by participating in legal proceedings using wrong corporate name, and "prolonged [plaintiff]'s confusion by filing an answer" that was misleading as to employer's identity); *Abraham v. B.G. Boltons' Grille & Bar*, 2007 WL 2688879, *2-3 (D. Kan. Sept. 13, 2007) (rejecting argument that plaintiff's motion to amend to correct name of defendant was untimely, where defendants' answer was "carefully worded so as not to cue Plaintiff into his error," proper defendant had been aware of lawsuit since its inception, and plaintiff had made adequate showing of good cause); *Williams v. Enterprise City Schools*, 2007 WL 30226, *3 (M.D. Ala. Jan. 4, 2007) (plaintiff was allowed to amend Complaint to name correct defendant, Enterprise City Board of Education, rather than originally-named defendant, Enterprise City Schools, inasmuch as the Board knew or should have known that the plaintiff would have named it as the defendant but for her mistake, and defendant "cannot escape the role it played in permitting [the plaintiff] to be mistaken about the proper name of her employer").

allowed amendment of pleadings to correct a misnomer in a defendant's name at even later stages of the litigation than that presented here.  *See, e.g., United States v. Davis*, 261 F.3d 1, 33 n.25 (1st Cir. 2001) (rejecting defendant's post-judgment misnomer defense that it was improperly named as "Ashland Chemical Inc." rather than "Ashland Chemical Co." where correct entity received adequate notice of suit and owned facility from which liability stemmed); *My Favorite Muffin Too, Inc. v. DK Holdings, Inc.*, 61 F. Supp.2d 781, 784 (N.D. Ill. 1999) (following conclusion of arbitration proceedings and entry of award, court allowed plaintiff to correct defendant's name from DK Holdings, Inc., to proper name of DK Holding Corporation Too, Inc., where that entity had, in essence, been before court and arbitrator from the beginning).

Equally unavailing is defendants' contention that the amendment would be prejudicial. Defendants' position is that "neither this subsidiary of the State of Alabama nor the State of Alabama have participated in" this action, and that "[i]nserting a new defendant in the place of a non-existent entity would radically alter the case."  (Doc. 58-2, at 6.)  But the Thirteenth Judicial Circuit Court was clearly on notice from the time that process was served on the 13th Judicial Police Department through Judge Johnston that Pears was trying to sue it.  If that entity chose to remain on the sidelines, despite notice, for the 12 months that this action has proceeded, it has only itself to blame for the consequences of that strategic choice.  This is not prejudice.  Nor is it at all apparent that the correct entity has not, in fact, been participating.  If the 13th  Judicial Police Department is, as defendants claim, "a non-existent entity," then how has it filed an Answer and actively participated in discovery and motion practice in this action for the last 12 months?  Because defendants' evidence is that Mobile County does not control or supervise the 13th Judicial Police Department, surely the County could not properly purport to speak for the named defendant in this litigation.  Simply put, defendants have made no showing that the correct entity or its agent has not in fact been pulling the strings of the defense actively mustered by the "non-existent entity" herein, and therefore have failed to establish prejudice.

The point -- namely, that the correct entity has been a participant in this litigation since its inception -- is sharpened by examination of Pears' official-capacity claims against Chief Collier.  The law of this Circuit allows a Title VII plaintiff to file suit against "supervisory employees in their capacity as agents of the employer."  *Hinson*, 231 F.3d at 827; *see also Busby*, 931 F.2d at 772 ("We think the proper method for a plaintiff to recover under Title VII is by

suing the employer, ***either by naming the supervisory employees as agents of the employer*** or by naming the employer directly.") (emphasis added); *Portera*, 322 F. Supp.2d at 1287 (in Title VII context, "[a] suit against the Department of Finance may be commenced by naming either the supervisory employee as an agent of the employer ... or by naming the employer directly. Either way, the effect is the same ...."). Likewise, in § 1983 actions, the law is well established that a suit against a government supervisor in his official capacity is the same as a suit against the entity itself. *See, e.g., Alexander v. Fulton County, Ga.*, 207 F.3d 1303, 1322 n.14 (11th Cir. 2000) (plaintiff's Title VII and § 1983 action "against Sheriff Barrett in her official capacity is the functional equivalent of suing the County"); *Jones v. Cannon*, 174 F.3d 1271, 1293 n.15 (11th Cir. 1999) ("Official capacity claims are tantamount to a suit against the governmental entity involved."). Pears expressly sued Chief Collier in both his individual and his official capacities. Chief Collier's official capacity was Chief of the Thirteenth Judicial Police Department, a position he still held when he was served with process. Chief Collier averred that he was employed at all relevant times by the Thirteenth Judicial Circuit of Alabama. (Collier Aff., ¶ 1.) As such, Pears' claims against Chief Collier in his official capacity are tantamount to claims against the governmental entity that employed him, to-wit: Thirteenth Judicial Circuit of Alabama, the very entity that defendants claim has never participated in this lawsuit. Defendants are wrong. That entity has been joined in this litigation from the outset, and cannot be heard now to protest otherwise.[36]

Defendants' final argument is that the Rule 16(b) deadline for amending the pleadings

---

[36]     Defendants stumble over this very point in their principal brief. They acknowledge that "a Plaintiff may either name his supervisor as an agent of the employer or name the employee directly" and that "[a]ny claim against the supervisory employee in their official capacity is redundant if the employer is already a defendant." (Doc. 50-2, at 16.) Thus, defendants have correctly conceded that a Title VII plaintiff has the option of suing either the employer or the supervisor in his official capacity, and that in either circumstance the employer has been properly joined. So, following the logic of defendants' own brief, Pears joined Thirteenth Judicial Circuit of Alabama as a defendant in this action by suing Chief Collier (a government official employed by that entity) in his official capacity, rendering it unnecessary for Pears to name Thirteenth Judicial Circuit of Alabama separately as a defendant. In short, Thirteenth Judicial Circuit of Alabama has always been joined as a defendant in this case, by virtue of the official-capacity claims against Chief Collier.

expired sometime ago.  This is true.  It is also true that where a request to amend is filed after that scheduling order deadline, "the party must show good cause why leave to amend the complaint should be granted."  *Smith v. School Bd. of Orange County*, 487 F.3d 1361, 1366 (11th Cir. 2007); *see also* Rule 16(b)(4), Fed.R.Civ.P. (modifications to scheduling orders may be made "only for good cause and with the judge's consent").  Based on the foregoing discussion, including specifically plaintiff's confusion as to the proper name of the employer defendant and defendants' role in misleading him until that deadline had passed, the Court finds the requisite good cause to authorize the amendment at this time.  *See generally Scheidecker v. Arvig Enterprises, Inc.*, 193 F.R.D. 630 (D. Minn. 2000) (finding good cause for modification of Rule 16(b) deadline for amending pleadings, where plaintiff sought to correct name of defendant employer, defendant had been "somewhat coy" about identity of employer, defendant was on notice of entity plaintiff was trying to sue, and amendment would correct uncertainties as to plaintiff's true employer).

For all of the foregoing reasons, plaintiff's request to amend the pleadings to correct the mislabeling of defendant "13th Judicial Police Department" is **granted**.  The Complaint is deemed **amended** pursuant to Rules 15 and 16 to correct the misnomer of that defendant's name and reflect its proper name, to-wit: Thirteenth Judicial Circuit of Alabama.[37]  Accordingly, Thirteenth Judicial Circuit of Alabama shall henceforth be considered the operative governmental defendant in this action, and references to that defendant as 13th Judicial Police

---

[37]     On summary judgment, no party has challenged the proposed amendment on the grounds that the applicable statute of limitations has expired; therefore, the Court will not *sua sponte* evaluate whether the amendment would relate back pursuant to Rule 15(c)(1)(C), Fed.R.Civ.P.  By all appearances, however, the relation back doctrine would apply here, given that the correctly named defendant had adequate notice of these proceedings, had already been joined by virtue of the claims against Chief Collier in his official capacity, and should have known that it would have been named in the Complaint but for a mistake by Pears.  *See, e.g., Wayne v. Jarvis*, 197 F.3d 1098, 1103 (11th Cir. 1999) (noting that Rule 15(c)'s mistake proviso "is meant to allow an amendment changing the name of a party to relate back to the original complaint only if the change is the result of an error, such as a misnomer or misidentification") (citation omitted); *Arthur v. Maersk, Inc.*, 434 F.3d 196, 209 (3rd Cir. 2006) ("An amendment naming a new party will relate back to the original complaint if the party had adequate notice of the action and should have known that it would have been named in the complaint but for a mistake").

Department will be deleted.[38]

## IV.    Analysis of Merits of Plaintiff's Claims.

When the dust settles after these protracted preliminaries, the following claims remain in play: (1) Title VII race discrimination and retaliation claims against Thirteenth Judicial Circuit of Alabama and Chief Collier (official capacity only); (2) Section 1983 race discrimination and retaliation claims against Thirteen Judicial Circuit of Alabama and Chief Collier (individual capacity only), with such claims having both equal protection and § 1981 components; and (3) Section 1981 race discrimination and retaliation claims against Chief Collier (individual capacity only).  Because the legal standards governing each of these categories of claims are the same, it is unnecessary to evaluate separately the Title VII, the Section 1983 and the Section 1981 causes of action.[39]  However, it will be beneficial to break out the race discrimination theories from the retaliation theories, for analytical purposes, and to consider in isolation the evidence against Chief Collier.

### A.    *The* McDonnell Douglas *Framework.*

The parties' summary judgment arguments on Pears' discrimination and retaliation claims will be evaluated in accordance with the time-honored *McDonnell Douglas* framework. Absent direct evidence of discrimination or retaliation (which has not been presented here),

---

[38]    The Court recognizes, of course, that certain affirmative defenses may be available to Thirteenth Judicial Circuit of Alabama as to certain claims; however, defendants have never invoked them as to this specific defendant, and this Court will not formulate the movants' summary judgment theories or affirmative defenses on their behalf.

[39]    *See, e.g., Butler v. Alabama Dep't of Transp.*, 536 F.3d 1209, 1215 (11th Cir. 2008) (reciting identical standards for Title VII and § 1981 claims of discrimination); *Goldsmith v. Bagby Elevator Co.*, 513 F.3d 1261, 1277 (11th Cir. 2008) (reciting identical standards for retaliation claims under Title VII and § 1981); *Standard v. A.B.E.L. Services, Inc.*, 161 F.3d 1318, 1330 (11th Cir. 1998) (explaining that Title VII and § 1981 claims "have the same requirements of proof and use the same analytical framework"); *Crawford v. Carroll*, 529 F.3d 961, 970 (11th Cir. 2008) ("the analysis of disparate treatment claims under § 1983 is identical to the analysis under Title VII where the facts on which the claims rely are the same"); *Stallworth v. Shuler*, 777 F.2d 1431, 1433 (11th Cir. 1985) ("Where, as here, a plaintiff predicates liability under Title VII on disparate treatment and also claims liability under sections 1981 and 1983, the legal elements of the claims are identical ... [and] we need not discuss plaintiff's Title VII claims separately from his section 1981 and section 1983 claims.").

Pears must make a showing of circumstantial evidence that satisfies the test set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). Under this familiar burden-shifting analysis, plaintiff is required to make out a *prima facie* case of race discrimination and/or retaliation.[40]  If he does so, that showing "creates a rebuttable presumption that the employer acted illegally." *Underwood v. Perry County Com'n*, 431 F.3d 788, 794 (11th Cir. 2005).

At that point, "the burden shifts to the employer to articulate some legitimate, nondiscriminatory reason for the adverse employment action. ... If the employer does this, the burden shifts back to the plaintiff to show that the employer's stated reason was a pretext for discrimination." *Crawford v. Carroll*, 529 F.3d 961, 976 (11th Cir. 2008) (citations and internal quotation marks omitted); *see also Holifield v. Reno*, 115 F.3d 1555, 1566 (11th Cir. 1997) (outlining similar procedure for Title VII retaliation claims).  A plaintiff may establish pretext "either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence." *Brooks v. County Com'n of Jefferson County, Ala.*, 446 F.3d 1160, 1163 (11th Cir. 2006) (quotation omitted).  Either way, "[i]f the proffered reason is one that might motivate a reasonable employer, a plaintiff cannot recast the reason but must meet it head on and rebut it. ... Quarreling with that reason is not sufficient." *Wilson*, 376 F.3d at 1088; *see also Rioux v. City of Atlanta, Ga.*, 520 F.3d 1269, 1278 (11th Cir. 2008) ("It is the plaintiff's burden not merely to raise a suspicion regarding an improper motive, but rather to demonstrate there is a genuine issue of material fact that the employer's proffered reason for [the adverse employment action] was pretexual.").  The ultimate burden of persuasion remains with the plaintiff.  *See E.E.O.C. v. Joe's Stone Crabs, Inc.*, 296 F.3d 1265, 1273 (11th Cir. 2002).  Thus, "[i]f the plaintiff does not proffer sufficient evidence to create a genuine issue of material fact regarding whether each of the defendant employer's articulated reasons is pretextual, the employer is entitled to summary judgment." *Chapman v. AI Transport*, 229 F.3d 1012, 1024-25 (11th Cir. 2000) (*en banc*).

---

[40]     Pears' burden of establishing a *prima facie* case is not heavy.  *See Crapp v. City of Miami Beach*, 242 F.3d 1017, 1020 (11th Cir. 2001) ("the *prima facie* requirement is not an onerous one").

**B.      *Plaintiff's Race Discrimination Causes of Action.***

Plaintiff's race discrimination claims are focused exclusively on his contention that he was discharged because he is African-American.  Defendants' briefs do not question whether Pears can establish a *prima facie* case of race discrimination with respect to his termination.  In light of this omission, the Court will not *sua sponte* analyze the adequacy of plaintiff's evidence to satisfy the relevant *prima facie* test for race discrimination, but will instead advance to the next step of the *McDonnell Douglas* framework.[41]

Defendants unquestionably satisfy their burden of production in proffering a legitimate nondiscriminatory reason for Pears' discharge.  In particular, defendants maintain, and offer supporting evidence, that Pears was fired for having a positive drug test in January 2007.  According to their discovery responses, defendants' position is that "Pears was terminated due to the fact that a random drug test showed that he had an unacceptable level of benzodiazepine in his system."  (Plaintiff's Exh. 27, at #3.)  Defendants' evidence is that Lt. Patterson and/or Chief Collier recommended to Judge Graddick that Pears be fired for his positive drug test result, and that Judge Graddick concurred with and adopted that recommendation with no independent investigation.[42]  Defendants having thus met their burden of production, it becomes incumbent on Pears to make a showing of pretext.  A plaintiff's pretext evidence "must reveal such

---

[41]      By skipping the *prima facie* test portion of the analysis, defendants have in large measure excused Pears from coming forward on summary judgment with evidence tying his discharge to his race.  Although the pretext analysis set forth *infra* cases substantial doubt on the veracity of defendants' stated reasons and enables Pears to survive summary judgment, he should not expect his race discrimination claims to reach a jury at trial without an evidentiary showing that the adverse action was taken <u>because of</u> his race.

[42]      In their briefs, defendants suggest that Pears also violated the drug policy by failing to report to his supervisors that the substance for which he tested positive was in his body, and by failing to notify his supervisors of a Demerol prescription.  (Doc. 50-2, at 21-22; doc. 58-2, at 13.)  These contentions are red herrings.  There is not a shred of evidence that defendants fired Pears for failing to report either that he was taking Demerol, or that he had been given benzodiazepine in an anesthetic during minor surgery; rather, defendants' witnesses and discovery responses are unequivocal that the termination decision was predicated exclusively on Pears' positive drug test, not for violation of any reporting requirement.  Besides, defendants point to no evidence that failure to disclose a Demerol prescription or all ingredients of a dental surgery anesthetic would be grounds for termination under Department policies.

weaknesses, implausibilities, inconsistencies, incoherencies or contradictions in the employer's proffered legitimate reasons for its actions that a reasonable factfinder could find them unworthy of credence." *Vessels v. Atlanta Independent School System*, 408 F.3d 763, 771 (11th Cir. 2005) (quotation omitted); *see also Rioux*, 520 F.3d at 1278 ("The plaintiff must demonstrate weaknesses or implausibilities in the employer's proffered legitimate reasons for its action sufficient for a reasonable factfinder to disbelieve the reasons."); *Jackson v. State of Alabama State Tenure Comm'n*, 405 F.3d 1276, 1289 (11th Cir. 2005) (to demonstrate pretext, a plaintiff must show that the employer's offered reason was not the true reason for its decision, "either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence").

Although he in no way challenges the results of the drug test, Pears marshals two distinct arguments in an effort to show pretext. First, he asserts that defendants' failure to offer him a "last chance agreement" pursuant to the County of Mobile's Drug-Alcohol Policy violated the policy and therefore is evidence of pretext. (Doc. 55, at 26.) Plaintiff's evidence is that Mobile County's drug testing policy applied to officers of the 13th Judicial Police Department. (Pafenbach Dep., at 19-20.)[43] That policy sets forth circumstances under which employees who test positive may avoid discharge by entering into a so-called "last chance agreement." (Plaintiff's Exh. 30.) Plaintiff's evidence is that he was never offered a last chance agreement. (Pears Decl., at 1.) But nothing in the text of the policy requires the Thirteenth Judicial Circuit of Alabama to offer last chance agreements to every employee who tests positive for a controlled substance. Moreover, Judge Graddick (the final decisionmaker as to Pears' discharge) testified

---

[43]     The County Administrator testified that Mobile County's drug testing policy "applies to the employees of any appointing authority who participate in our worker's comp program," and that the 13th Judicial Police Department in fact participates in said program. (Pafenbach Dep., at 20.) The Administrator later waffled by stating that "[t]he policy was written for merit system employees," which would exclude court police from its ambit, but that "if their appointing authority wishes to participate in the worker's comp program, they are supposed to follow the policy." (*Id.* at 25-26.) The end result is the same, to-wit: that 13th Judicial Police Department employees should be covered by the Mobile County drug testing policy. This inference is bolstered by Lt. Patterson's testimony that he recommended Pears' dismissal because the positive drug test was "a violation of the county policy." (Patterson Dep., at 87.)

to his understanding of the policy that employees were eligible for last chance agreements only if they self-reported a drug problem.  (Graddick Dep., at 56-57.)  Pears did not.  Finally, the policy provides that the "last chance" option is available only for employees who report to an approved substance abuse professional for counseling and evaluation within five days.  (Plaintiff's Exh. 30.)  There is no indication in the record that Pears ever did so, or that he ever acknowledged a substance abuse problem, which appears to be a prerequisite for the last chance option outlined in the policy.  Plaintiff identifies no aspect of the policy that would allow an employee who steadfastly denied responsibility for a positive drug test to avail himself of a "last chance" arrangement.  For all of these reasons, defendants' failure to offer Pears a last chance agreement following his positive drug test did not violate the written policy and is not indicative that defendants' stated reason for firing him was pretextual.

Pears' second pretext argument fares better.  Viewing the record in the light most favorable to plaintiff, the mere presence of benzodiazepine in Pears' system, without more, was not a terminable offense.  Rather, the key factor justifying defendants' discharge decision was the absence of any innocent explanation for that test result.  Defendants' evidence stakes them to a position that if Pears had come forward with a valid reason for testing positive for benzodiazepine, then they would not have discharged him.[44]  But Pears did exactly that.  Within days after learning that he was being discharged for testing positive for benzodiazepine, Pears furnished Judge Graddick and other supervisors with documentation from Dr. Lairmore's office confirming that he had been administered Valium (a benzodiazepine) during oral surgery on December 28, 2006.  Pears also notified these individuals that his dentist had stated that "the drug valium would test positive for Temazepam."  (Plaintiffs' Exh. 22.)

Yet upon receipt of this potentially exculpatory information, defendants did not follow

---

[44]     The following exchange took place during the deposition of the decisionmaker, Judge Graddick, in this case:

"Q:     Well, would it have -- hypothetically, if Mr. Pears was given the substance that appeared in his blood sample when he had oral surgery, if that was the case, would he have been fired?

"A:     No."

(Graddick Dep., at 48.)

up.  There is no evidence that defendants undertook any investigation into the veracity or plausibility of Pears' explanation.  There is no evidence that defendants contacted Pears, Dr. Lairmore, or any chemist or testing facility for information about whether the Valium administered to Pears during surgery one week before the random drug test could have produced the positive result.  At most, defendants offer Judge Graddick's testimony that he "was told" by either Chief Collier or Lt. Patterson that "the apparent substance that he was supposed to have been given in the dental surgery ... didn't match the ingredients of what he had in his system," but that he did not know where they had gotten that information.  (Graddick Dep., at 47-50.) There is no evidence that Chief Collier or Lt. Patterson performed any investigation at all before advising Judge Graddick that the substances did not "match," which is a very different question from whether Valium could induce a positive test result for Temazepam (as Pears had contended to them in writing) because they are in the same class of benzodiazepines, notwithstanding the chemical differences between them.

So here, then, is defendants' problem.  They have staked themselves to a position that (a) they fired Pears because the January 4 drug test "showed that he had an unacceptable level of benzodiazepine in his system"; and (b) that Pears would not have been fired if he had a valid explanation for how the benzodiazepine reached his system.  Yet when Pears provided defendants with detailed information demonstrating a lawful, innocuous alternative explanation why he tested positive for benzodiazepine, a reasonable inference from the record is that defendants ignored him.  Further reasonable inferences can be drawn that Lt. Patterson and Chief Collier (the advisers on whom Judge Graddick relied completely in forming his decision) performed no investigation, and never looked into whether the benzodiazepine that Pears received during dental surgery just days earlier could have triggered his positive result for benzodiazepine (albeit a different chemical within that class of medications).  This unexplained omission raises substantial questions about the veracity of defendants' stated reason for discharging him, and constitutes just the sort of weakness, inconsistency or implausibility that courts have deemed sufficient to satisfy a plaintiff's burden of showing pretext, and to overcome a motion for summary judgment.  A reasonable inference could be drawn that Judge Graddick's advisers intentionally gave him false reassurances that Valium could not have created the positive test result, in order to keep the termination decision intact and to further a nefarious

purpose. That is sufficient to establish pretext. *See, e.g., Woodard v. Fanboy, L.L.C.*, 298 F.3d 1261, 1265 (11th Cir. 2002) ("A showing that a defendant has lied about the reasons for his acts ... can be strong evidence that a defendant has acted with discriminatory intent."); *Hinson*, 231 F.3d at 831 ("in some Title VII cases it is permissible for the trier of fact to infer the ultimate fact of discrimination from the falsity of the employer's explanation") (internal quotation marks and citations omitted). Accordingly, defendants' Motion for Summary Judgment is **denied** with respect to the remaining claims of race discrimination relating to Pears' discharge.[45]

---

[45]     A trio of defendants' counterarguments will be addressed before we move on. First, it is quite clear that a defendant's mistaken belief about underlying facts does not constitute pretext. *See, e.g., Rojas v. Florida*, 285 F.3d 1339, 1342 (11th Cir. 2002) ("We are not interested in whether the conclusion is a correct one, but whether it is an honest one."); *Wascura v. City of South Miami*, 257 F.3d 1238, 1247 (11th Cir. 2001) ("We have repeatedly and emphatically held that a defendant may terminate an employee for a good or bad reason without violating federal law. We are not in the business of adjudging whether employment decisions are prudent or fair. Instead, our sole concern is whether unlawful discriminatory animus motivates a challenged employment decision."). But that principle cannot aid defendants in this case, inasmuch as the record supports a reasonable inference that defendants' stated reasons were not honest. By their own admission, they would not have fired Pears for having an anesthetic in his system from oral surgery several days earlier; however, when confronted with evidence that his positive test result might be explained by just such an anesthetic, they neither rescinded the termination nor investigated the viability of that explanation. A reasonable factfinder could conclude from this fact that an unlawful motivation was afoot. Second, accepting defendants' position that Judge Graddick honestly believed that the anesthetic could not have caused Pears' positive drug test, his honest belief does not necessarily exonerate defendants. After all, Judge Graddick was relying exclusively on information provided by supervisors (Lt. Patterson and/or Chief Collier). If those advisers induced Judge Graddick to rubber stamp a termination decision based on falsified information about the impact of Valium on Pears' drug test results, then their improper motivations may be imputed to the Thirteenth Judicial Circuit of Alabama under a "cat's paw" theory. *See, e.g., Dwyer v. Ethan Allen Retail, Inc.*, 2009 WL 997008, *2 (11th Cir. Apr. 15, 2009) ("Under this theory, a non-decisionmaking employee's discriminatory animus may be imputed to a neutral decisionmaker when the decisionmaker has not independently investigated allegations of misconduct."); *Williams v. Alabama Dep't of Transp.*, 509 F. Supp.2d 1046, 1060 (M.D. Ala. 2007) (the bias of a recommender "corrupts the entire process where the decisionmaker merely rubber stamps the recommendation"). Third, defendants' contention that Pears cannot establish pretext because he stated in his deposition that his case is built only on his "opinion" and that he has no evidence is an unfair distortion of the record. (Doc. 50-2, at 24-25; doc. 58-2, at 17.) Far from relying on conclusory opinions to show that he was subjected to race discrimination and retaliation, Pears has submitted nearly 200 pages of supporting evidence. (*See* doc. 56.) Defendants' attempt to parlay an out-of-context deposition exchange predicated

-37-

**C.      *Plaintiff's Retaliation Causes of Action.***

Title VII bars an employer from retaliating against an employee "because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter."  42 U.S.C. § 2000e-3(a); *see Gupta v. Florida Bd. of Regents*, 212 F.3d 571, 586 (11th Cir. 2000) ("Retaliation is a separate violation of Title VII.").[46]  Such retaliatory conduct is also proscribed under §§ 1981 and 1983.  *See, e.g., Goldsmith v. Bagby Elevator Co.*, 513 F.3d 1261, 1277 (11th Cir. 2008) (elements of § 1981 retaliation claim are identical to those of Title VII retaliation claim).  Unlike his race discrimination claims, which are confined to his termination, Pears' retaliation causes of action are rooted in three different personnel actions, to-wit: (i) his suspension without pay in June 2006; (ii) his unsatisfactory performance rating in July 2006; and (iii) the termination of his employment in January 2007. These retaliation claims will now be considered.[47]

              *1.      Plaintiff's* Prima Facie *Showing of Retaliation.*

"A *prima facie* case of retaliation under Title VII requires the plaintiff to show that: (1) she engaged in an activity protected under Title VII; (2) she suffered an adverse employment action; and (3) there was a causal connection between the protected activity and the adverse employment action."  *Crawford*, 529 F.3d at 970; *see also Butler v. Alabama Dep't of Transp.*,

_____

on unfair loaded questions from defense counsel into an irrebuttable admission that plaintiff's case consists of nothing more than self-serving speculation cannot succeed.

    [46]      *See also Sullivan v. National R.R. Passenger Corp.*, 170 F.3d 1056, 1059 (11th Cir. 1999) ("retaliation is a separate offense under Title VII; an employee need not prove the underlying claim of discrimination for the retaliation claim to succeed").

    [47]      Plaintiff's Complaint lacks any reference to the suspension or the performance evaluation aspects of the retaliation claim.  Indeed, it appears that Pears injected these claims into the case for the first time in his summary judgment brief.  Nonetheless, defendants responded to these new aspects of the retaliation claim by briefing them in their reply (doc. 58-2) without objecting to their belated inclusion in the lawsuit; therefore, those claims will be recognized by the Court as if they had been properly pleaded.  *See Steger v. General Elec. Co.*, 318 F.3d 1066, 1077 (11th Cir. 2003) ("issues not raised in the pleadings may be treated as if they were properly raised when they are tried by express or implied consent of the parties"); Rule 15(b), Fed.R.Civ.P.

536 F.3d 1209, 1212-13 (11th Cir. 2008) ("To establish a claim of retaliation under Title VII or section 1981, a plaintiff must prove that he engaged in statutorily protected activity, he suffered a materially adverse action, and there was some causal relation between the two events.") (citation omitted).  Defendants do not argue that Pears did not engage in protected activity, nor could they reasonably do so given the evidence that Pears articulated good-faith complaints of race discrimination to his supervisors in June 2006 concerning scheduling, overtime, promotions, raises and assignments.  Accordingly, the Court need not address the first element of the *prima facie* test further.

With respect to the second requirement, there can be no doubt that termination of employment and a five-day suspension without pay qualify as adverse employment actions under any reasonable definition of the term.  Nonetheless, defendants contend that summary judgment is warranted on Pears' retaliation claims concerning the July 2006 performance evaluation because the unsatisfactory evaluation is not an adverse action.  This argument fails for two reasons.  First, defendants incorrectly invoke the more stringent standard for adverse employment actions in discrimination claims, rather than the more liberal standard applicable in the retaliation setting.[48]  The test for adverse employment actions in retaliation cases is whether the employer's conduct "might deter a reasonable employee from pursuing a pending charge of discrimination or making a new one."  *Crawford*, 529 F.3d at 974.  Indeed, the Eleventh Circuit has read Supreme Court precedent as "strongly suggest[ing] that it is for a jury to decide whether anything more than the most petty and trivial actions against an employee should be considered 'materially adverse' to him and thus constitute adverse employment actions."  *Id.* at 973 n.13.  Certainly, an unsatisfactory performance rating – the only one ever issued to a Thirteenth Judicial Police Department officer – might deter a reasonable employee from pursuing a charge of discrimination; thus, a jury issue exists as to whether that evaluation is materially adverse.

---

[48]     *Compare Crawford*, 529 F.3d at 973-74 (noting that the Supreme Court has "effectively rejected the standards applied by this court ... that required an employee to show either an ultimate employment decision or substantial employment action to establish an adverse employment action for the purpose of a Title VII retaliation claim") *with Butler*, 536 F.3d at 1215 (in Title VII discrimination context, adverse employment action element requires employee to show "a serious and material change in the terms, conditions, or privileges of employment").

Second, defendants' strategy of singling out alleged retaliatory acts for "adverse employment action" analysis, rather than considering them in the aggregate, runs counter to Eleventh Circuit guidance.  *See, e.g., Akins v. Fulton County, Ga.*, 420 F.3d 1293, 1301 (11th Cir. 2005) ("In deciding whether employment actions are adverse, we consider the employer's acts both individually and collectively."); *Bass v. Board of County Com'rs, Orange County, Fla.*, 256 F.3d 1095, 1118 (11th Cir. 2001) ("While the other actions might not have individually risen to the level of adverse employment action under Title VII, when those actions are considered collectively, the total weight of them does constitute an adverse employment action.").  When the poor evaluation is coupled with the other allegedly retaliatory acts, Pears has plainly made an adequate showing of adverse employment action to meet his burden at the *prima facie* stage of the analysis.

Defendants also fault plaintiff's *prima facie* showing on the ground that Pears "has absolutely no evidence of the third element, causation."  (Doc. 58-2, at 12.)  The Court disagrees.  "To establish a causal connection, a plaintiff must show that the decision-makers were aware of the protected conduct, and that the protected activity and the adverse action were not wholly unrelated."  *Gupta*, 212 F.3d at 590 (citation omitted); *see also Goldsmith*, 513 F.3d at 1278 ("We construe the causal link element broadly so that a plaintiff merely has to prove that the protected activity and the negative employment action are not completely unrelated.") (citation omitted).  The thrust of defendants' causal connection argument is that the lapse of seven months between Pears' complaints of discrimination in May and June 2006, and his dismissal in January 2007, negates any causal link between the two sets of events.  As a threshold matter, the temporal proximity is sufficiently close to satisfy the causal connection requirement with respect to the June 2006 suspension (which was announced just two weeks after Pears' first written complaint of discrimination) and the July 2006 performance evaluation (which was issued approximately one and a half months after Pears furnished defendants with details of his discrimination allegations).  *See, e.g., Thomas v. Cooper Lighting, Inc.*, 506 F.3d 1361, 1364 (11th Cir. 2007) ("The burden of causation can be met by showing close temporal proximity between the statutorily protected activity and the adverse employment action."); *Bass*, 256 F.3d at 1119 ("Close temporal proximity between the protected activity and the adverse action may be sufficient to show that the two were not wholly unrelated.").

As to the termination, defendants are correct that a seven-month gap is too large for a causal connection to be based solely on temporal proximity.[49]  But close temporal proximity is not the only means by which a plaintiff can establish a causal connection.  To the contrary, courts have routinely found a causal connection even as to retaliatory acts occurring long after the protected activity, where those events are linked by a chain of intervening retaliatory acts.  *See, e.g., Bass*, 256 F.3d at 1117-19 (deeming causal connection element satisfied even though adverse action occurred more than one year after EEOC charge, where retaliatory acts commenced shortly after charge was filed); *Wideman v. Wal-Mart Stores, Inc.*, 141 F.3d 1453, 1457 (11th Cir. 1998) (causal connection requirement satisfied where "the series of adverse employment actions commenced almost immediately after management learned she had filed the charge"); *Odom v. Mobile Infirmary*, 2008 WL 748398, *10 (S.D. Ala. Mar. 17, 2008) (causal connection element was established even though plaintiff was fired seven months after protected activity, where "the chain of retaliatory treatment commenced immediately after she complained").  Taken in the light most favorable to Pears, the summary judgment record shows that defendants began a campaign of retaliatory activity within days after he complained of race discrimination, including suspending him without pay, giving him the only unfavorable performance evaluation in the history of the Department, reprimanding him in writing for an argument that Lt. Patterson instigated, giving him another written reprimand for an incident that never occurred, and ultimately firing him for a drug test as to which he had provided a potentially valid explanation that was not investigated.  All of these acts occurred within a seven-month period, commencing immediately after Pears' first written complaint of race discrimination, and followed a period of more than a decade in which defendants had failed to document any performance issues relating to Pears.[50]  Reading the causal connection requirement

---

[49]     *See, e.g., Thomas*, 506 F.3d at 1364 ("A three to four month disparity between the statutorily protected expression and the adverse employment action is not enough."); *Higdon v. Jackson*, 393 F.3d 1211, 1221 (11th Cir. 2004) (three month period, by itself, "does not allow a reasonable inference of a causal relation between the protected expression and the adverse action").

[50]     In that regard, the only disciplinary writeup that defendants ever gave Pears prior to his discrimination complaint occurred in October 1995, when Judge Kittrell reduced to writing

broadly, as the Eleventh Circuit requires, this sequence of events is sufficient to establish the third element of his *prima facie* case, in that the alleged retaliatory acts and protected activity are not wholly unrelated.

>    2.    *Pretext.*

Pears having made a *prima facie* showing of retaliation concerning the suspension, evaluation and discharge, the burden of production shifts to defendants to come forward with evidence of legitimate nonretaliatory reasons for taking those adverse actions.  If defendants do so, then the critical question becomes whether Pears has made a sufficient showing of pretext to survive summary judgment scrutiny.  As always, the Court remains cognizant that "[t]he plaintiff bears the ultimate burden of proving retaliation by a preponderance of the evidence and that the reason provided by the employer is a pretext for prohibited retaliatory conduct."  *Goldsmith*, 513 F.3d at 1277.[51]

With respect to the June 2006 suspension, defendants' legitimate nonretaliatory explanation is that Pears was suspended for violating chain of command protocols.  It is undisputed that Pears had previously been notified in writing that Thirteenth Judicial Police Department employees sending letters of complaint to their immediate supervisor or Chief Collier "shall not send copies of the written letter or memo to anyone" else.  (Plaintiff's Exh. 28.)  It is also undisputed that Pears technically violated those instructions by sending his May 2006 internal complaint of race discrimination to his three police supervisors as well as Judges Johnston and Graddick.  But plaintiff's evidence is that (i) no other employee had ever been disciplined for violating the chain of command policy; and (ii) far from violating policy, defendant was actually acting in accordance with the Department's discrimination policy, which provided that if an employee's supervisor was the discriminatory actor, the employee's report

---

his concerns that Pears had arrived late for a Saturday morning meeting at which Judge Kittrell was speaking.  (Plaintiff's Exh. 20.)

>    [51]    "To show pretext, a plaintiff must come forward with evidence, including the previously produced evidence establishing the *prima facie* case, sufficient to permit a reasonable factfinder to conclude that the reasons given by the employer were not the real reasons for the adverse employment decision."  *Hurlbert v. St. Mary's Health Care System, Inc.*, 439 F.3d 1286, 1298 (11th Cir. 2006) (internal quotations and citations omitted).

should be directed above that person on the chain of command.[52]  In any event, defendants admit that Pears' May 2006 discrimination complaint was the catalyst for their decision to suspend him.  Whether their motivation in doing so was that Pears had violated the chain of command policy (as defendants contend) or unlawful retaliation (as plaintiff contends) is inherently a fact question for the jury.[53]  Accordingly, there is sufficient evidence of pretext to allow this aspect of Pears' retaliation causes of action to go to trial.

As for the July 2006 performance evaluation, the record evidence is that on July 31, 2006, Sgt. Hummel gave Pears a rating of "unsatisfactory."  (Plaintiff's Exh. 17.)  Defendants have submitted no evidence documenting a legitimate nonretaliatory reason for Sgt. Hummel's

---

[52]     Plaintiff also shows that Chief Collier would have granted Pears permission to present Judge Johnston with his race discrimination concerns, if Chief Collier "couldn't resolve this situation."  (Collier Dep., at 61.)  Given that Pears was complaining about discrimination by Chief Collier himself (among others), it seems inconceivable that Chief Collier could have resolved the matter.  The notion that an alleged perpetrator of discrimination is the gatekeeper for all complaints of discrimination, and that the alleged victim cannot address the matter with higher authorities without first securing the permission of that gatekeeper / discriminator, is at odds with considerable Title VII jurisprudence and the Department's own discrimination policy.  Yet, by defendants' own reckoning, it was Pears' failure to confront the gatekeeper / discriminator to request permission to report his misconduct to his supervisors that earned Pears a suspension.

[53]     The ambiguity of defendants' reasoning is underscored by the memorandum authored by Lt. Patterson and Sgt. Hummel explaining their suspension recommendation.  Although that memo cites the chain of command policy, the supervisors make little effort to conceal their displeasure with Pears' allegations, branding him a "disgruntle [sic] employee" and expressing outrage that his claims were "totally false, have no substance and are totally frivolous."  (Plaintiff's Exh. 12.)  A reasonable jury could read the Patterson/Hummel memorandum as exhibiting animosity toward Pears for complaining of race discrimination, rather than a desire to enforce a chain of command policy (for which no employee had ever been disciplined before).  As for defendants' suggestion that "[t]he recommendations of Collier, Patterson and Hummell [sic] are irrelevant" (doc. 58-2, at 8), the law is otherwise.  Defendants present no evidence that Judge Johnston performed independent investigation or did anything other than approve the recommendation of Chief Collier.  As such, even accepting defendants' conclusory contention that Judge Johnston's motivations were nonretaliatory, defendants could remain liable for retaliation if the recommenders were driven by retaliatory animus.  *See, e.g., Crawford*, 529 F.3d at 979 n.21 ("Under a 'cat's paw' theory, a non-decisionmaking employee's discriminatory animus may be imputed to a neutral decisionmaker when the decisionmaker has not independently investigated allegations of misconduct.").

rating.  The record contains no explanation from Sgt. Hummel as to why he rated Pears as he did.
His deposition was not taken, and defendants have furnished no affidavit from him purporting to
explain his decision.  Instead, defense counsel theorizes that Sgt. Hummel gave Pears a negative
review because of attitude problems identified by Lt. Patterson in his deposition.  But there is no
indication that Lt. Patterson had anything to do with the performance evaluation.  Defense
counsel also speculates that Sgt. Hummel's unfavorable rating of Pears was motivated by the
same concerns documented in the Patterson/Hummel memo dated seven weeks earlier.  Such
conjecture and innuendo is wholly inadequate to satisfy even defendants' modest burden of
production, which requires the employer to "produce admissible evidence which would allow the
trier of fact rationally to conclude that the employment decision had *not* been motivated by
discriminatory animus."  *Combs v. Plantation Patterns*, 106 F.3d 1519, 1528 (11th Cir. 1997)
(citations omitted).  This burden of production is exceedingly light, but is not so ethereal as to be
nonexistent, and defendants cannot satisfy it with unvarnished guesswork and cursory
conclusions unbacked by evidentiary support.[54]  Here the record is devoid of any evidence
explaining why Sgt. Hummel gave Pears an unsatisfactory performance evaluation within weeks
after he complained of race discrimination.  Defendants' failure to satisfy their burden of
production as to this aspect of Pears' retaliation claims precludes them from being granted
summary judgment concerning same.[55]

---

[54]    *See, e.g., Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248, 254-55,
101 S.Ct. 1089, 67 L.Ed.2d 207 (1981) (to raise genuine issue of fact, defendant "must clearly
set forth, through the introduction of admissible evidence, the reasons for" the challenged
personnel decision); *IMPACT v. Firestone*, 893 F.2d 1189, 1193 (11th Cir. 1990) (reversing
lower court's finding that defendants satisfied burden of production where they merely
contended that person believed to be most qualified was hired); *Steger*, 318 F.3d at 1076
(applying *IMPACT* to deem inadequate defendant's general statement that employment decision
was predicated on hiring of best qualified applicant).

[55]    Even if defendants had met their burden, the Court finds ample evidence of
pretext to allow the performance evaluation-based retaliation claim to reach a jury.  Seven weeks
before giving Pears the only "unsatisfactory" performance rating in the history of the Thirteenth
Judicial Police Department, Sgt. Hummel co-authored a memorandum lambasting Pears for
having lodged an internal race discrimination complaint that was "totally false," and decrying
Pears' "audacity" for forwarding discrimination complaints about him to Judges Johnston and
Graddick.  (Plaintiff's Exh. 12.)  The tenor and tone of the Hummel/Patterson memorandum

Finally, with respect to Pears' retaliation claims relating to his discharge, the second and third steps of the *McDonnell Douglas* analysis track directly those for his race discrimination claims relating to his discharge. The Court has already found in Section IV.B., *supra*, that defendants have proffered a legitimate reason for firing Pears in January 2007, but that Pears has cast sufficient doubt on the veracity of that explanation to preclude entry of summary judgment for defendants as to the race discrimination variant of Pears' termination claims. The same reasoning and result applies to the retaliation claims predicated on Pears' discharge. There are genuine issues of material fact as to whether defendants fired Pears for failing a drug test, or whether that stated explanation was pretextual, with the real reason for Pears' termination being that he had made internal complaints of race discrimination by his supervisors, who recommended his termination with no independent investigation by the nominal decisionmaker. Plaintiff's evidence that defendants began a series of unprecedented adverse actions against him immediately after he complained of race discrimination, with those adverse actions culminating in his discharge, lends further credence to Pears' pretext argument.

For all of these reasons, defendants' Motion for Summary Judgment is **denied** as to plaintiffs' remaining retaliation-based causes of action.

### D.     *Plaintiff's Claims Against Chief Collier in his Individual Capacity.*

As discussed in Section III.A.2., *supra*, still pending in this case are claims against Chief Collier in his individual capacity under §§ 1981 and 1983. Defendants now argue that he is entitled to summary judgment on those claims because "[t]he undisputed evidence shows that Collier took none of the actions and made none of the decisions of which Plaintiff complains." (Doc. 58-2, at 16-17 (emphasis omitted).) This contention is undermined by the summary judgment record (and reasonable inferences from same) in several respects.

For example, Chief Collier's direct involvement in the June 2006 suspension is well documented in the record. On June 2, 2006, Chief Collier sent a terse letter to Pears notifying him that he would "face disciplinary action" for his internal complaint of discrimination.

---

injects sufficient doubt into Sgt. Hummel's motivations in giving Pears a negative evaluation so as to give rise to a reasonable inference of unlawful retaliation that cannot be resolved on summary judgment.

(Plaintiff's Exh. 10.)  The hostile tone of Chief Collier's June 2 letter (exemplified by the statement, "I expect to receive full details of your claims within ten days") lends further support to the notion that Chief Collier neither welcomed nor approved of Pears' internal report of race discrimination in the Thirteenth Judicial Police Department.  (*Id.*)  A reasonable factfinder reviewing that letter could infer that Chief Collier harbored retaliatory animus against Pears and that he had already decided that Pears would be punished for his protected activity.  This conclusion is bolstered by Chief Collier's follow-up letter, which branded Pears' discrimination complaint as an attempt to "supervise his supervisors" and offered a veiled threat of termination by reminding Pears of his at-will status.  (Plaintiff's Exh. 14.)  Moreover, Chief Collier specifically recommended that Pears be suspended without pay for five days.  (Plaintiff's Exh. 12.)  The decisionmaker, Judge Johnston, adopted that recommendation on the day it was made, with no indication that he performed any independent investigation.  It was Chief Collier who wrote and signed the June 16 memorandum to Pears imposing the suspension.  (Plaintiff's Exh. 13.)  Given these record facts, defendants' contention that Chief Collier played no role in the suspension flirts with absurdity.

The same is true with respect to Pears' termination.  The Court understands that Chief Collier denies having anything to do with the discharge decision.  (Collier Dep., at 74, 77, 85.)  But a reasonable jury would not be required to accept his testimony on this point.  After all, the two termination letters dated January 22, 2007 went out over Chief Collier's signature and were apparently hand-delivered by Chief Collier to Pears.  (Plaintiff's Exh. 21.)  If Chief Collier had nothing to do with Pears' termination, then why did the termination letters originate from him?  More generally, it defies common sense that the Chief of the Thirteenth Judicial Police Department would have had no involvement whatsoever in the discharge of one of his officers, but would instead delegate the investigation and recommendation to a subordinate (Lt. Patterson).  Judge Graddick's testimony adds further ambiguity to the matter, inasmuch as he does not recall whether he interfaced with Lt. Patterson, Chief Collier, or both concerning this matter.  (Graddick Dep., at 36, 48, 50.)  Taken in the aggregate, this and other record evidence could prompt a reasonable finder of fact to conclude that Chief Collier was directly involved in the decisionmaking process for Pears' discharge, notwithstanding his blanket denial of participation in same.  With regard to the termination, defendants agree that "Judge Graddick did

-46-

not perform an independent investigation." (Doc. 58-2, at 4.) If Chief Collier made recommendations to Judge Graddick concerning Pears' termination, and if Judge Graddick acted on those recommendations with no independent investigation, then any discriminatory or retaliatory animus by Chief Collier may be imputed to the final termination decision, even though he did not personally pull the trigger. *See Crawford*, 529 F.3d at 979 n.21.

Circuit law provides that a supervisor may be held liable in his individual capacity under § 1983 for violations of the equal protection clause in the employment context "when the supervisor personally participates in the alleged constitutional violation or when there is a causal connection between actions of the supervising official and the alleged constitutional deprivation." *Crawford*, 529 F.3d at 978. Taken in the light most favorable to the nonmovant, the record shows both personal participation by Chief Collier in the alleged unlawful employment actions and a causal connection between Chief Collier's conduct and those employment actions. Defendants' conclusory insistence in the face of this evidence that Chief Collier is exempt from liability because he took no actions and made no decisions does not suffice at this stage. Accordingly, the Motion for Summary Judgment is **denied** as to the remaining claims against Chief Collier in his individual capacity.

**V.   Conclusion.**

For all of the foregoing reasons, it is hereby **ordered** as follows:

1.    Defendants' Motion for Extension of Page Limitation (doc. 58) is **granted**, and their proposed Reply Brief (doc. 58-2) appended to that motion will be considered in its entirety.

2.    Plaintiff's request to amend the pleadings to correct the mislabeling of defendant "13th Judicial Police Department" is **granted**. The Complaint is deemed **amended** pursuant to Rules 15 and 16 to correct the misnomer of that defendant's name and reflect its proper name, to-wit: Thirteenth Judicial Circuit of Alabama. Inasmuch as Thirteenth Judicial Circuit of Alabama was already part of this action since its inception (by virtue of the official-capacity claims against defendant Chief Collier and the active participation of that same defendant, albeit via misnomer, throughout this case), no service of process is needed to join that

defendant.

3.      Defendants' Motion for Summary Judgment (doc. 50) is **granted in part, and denied in part**.  The Motion is **granted** with respect to the following: (i) all causes of action against defendant Mobile County; (ii) the Title VII claims against Chief Collier in his individual capacity; and (iii) the § 1983 claims against Chief Collier in his official capacity.  Those causes of action are **dismissed**.  In all other respects, the Motion for Summary Judgment is **denied**.

4.      Given the dismissal of all pending claims against Mobile County, the Clerk of Court is **directed** to terminate Mobile County as a party defendant.  The sole remaining defendants are Thirteenth Judicial Circuit of Alabama and Chief Collier.

5.      This action remains set for a final pretrial conference before the undersigned on **October 21, 2009** at **10:30 a.m.**, with jury trial to follow in the **November 2009** civil term.

DONE and ORDERED this 7th day of August, 2009.

s/ WILLIAM H. STEELE
UNITED STATES DISTRICT JUDGE